**TRANS OCEAN VAN SERVICE**
v.
The **UNITED STATES.**
No. 137–66.

United States Court of Claims.
Dec. 12, 1972.
As Amended Jan. 12, 1973.

606

Alan F. Wohlstetter, Washington, D. C., attorney of record, for plaintiff; Denning & Wohlstetter and Ernest H. Land, Washington, D. C., of counsel.

John Charles Ranney, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

COWEN, Chief Judge:*

This is one of the more than 800 cases, involving more than 800,000 separate shipments, now pending before the court in which carriers of household goods belonging to military personnel have sued the Government for additional compensation in connection with the transportation of such household goods between points in the continental United States and points overseas under bills of lading issued by the Department of Defense. In accordance with former Rule 47(c), now Rule 131(c), an initial trial was held on the issues of law and fact relating to the right of the plaintiff to recover on its claims and the right of the defendant to recover on its counterclaims. The court's decision with respect to the liability issues delineated by the parties at the initial trial was rendered on May 15, 1970 (426 F.2d 329, 192 Ct.Cl. 75), and the case was remanded to the commissioner for further proceedings under Rule 131(c).

As the parties were unable to agree on the amounts of the recoveries that should be allowed on certain shipments under the court's decision of May 15, 1970, it was necessary to receive additional evidence and to go through a second set of formal post-trial procedures in accordance with Rule 134.

This opinion will be limited to a discussion of those points which are still in controversy between the parties. The details concerning the matters as to which the parties are in agreement will be set out in the findings of fact and need not be repeated here.

### I. The "Diversion Without SIT" Claims

In the liability phase of this case one of the issues presented was whether, when a shipment arrived at the destination point and the carrier was directed to deliver the shipment to the property owner at a residential address not shown on the bill of lading, without an intervening period of storage-in-transit (SIT), there was a "diversion" of the shipment within the meaning of Item 150 of Military Basic Tender (MBT) No. 1. As indicated in findings of fact 27 and 29 of the decision on liability (426 F.2d 329, 339, 192 Ct.Cl. at 132 and 135), the term diversion is defined for the purposes of the present litigation as meaning " * * * any change from original delivery instructions, including consignment or reconsignment of a *destination point* after commencement of transportation service, when authorized by appropriate government transportation officer * * * " [Emphasis added]; and this is supplemented by an administrative regulation stating that any of the following actions affecting a shipment after it has been tendered to the carrier for transportation, and before it has been released from the custody of the carrier constitutes a diversion: (1) a change in the name of the consignor; (2) a change in the name of the consignee; (3) a change in the destination; (4) a change in the route, when requested by the transportation officer; or (5)

---

* The court acknowledges the assistance it has received from the report of Trial Commissioner Mastin G. White. We have adopted his opinion and findings of fact on most of the issues presented in this case.

any other instruction given to the carrier that is necessary to effect delivery and requires a change in the billing and/or an additional movement of the vehicle.

However, in the liability phase our attention was directed solely to a situation in which the residential address to which the carrier was instructed to deliver the shipment after arrival at the destination shown on the Government bill of lading (GBL), was in the same city in which was located the military installation shown as the destination. On those facts we held that there was no Item 150 diversion of the shipment merely because the owner's residential address was not set forth on the bill of lading but was given to the carrier after the shipment arrived at destination. We noted that MBT No. 1 and the regulations require the carrier to complete one delivery of the shipment at destination without compensation separate from the single factor rate for the line haul transportation of the shipment from point of origin to the destination point. We also pointed out that the parties understood at the time the carrier accepted custody of a shipment at the point of origin, the specific residential address of the property owner at or near his new military installation could not usually be ascertained until a later time. (426 F. 2d at 342–344, 192 Ct.Cl. at 101–104.) Therefore, we determined that it was within the contemplation of the parties that when the carrier notified the transportation officer at the destination that the shipment had arrived, he would direct the carrier to a specific residential address on or near the installation, or alternatively, to storage-in-transit until a specific delivery address was ascertained; and that if the residential address was located in the same city as the installation (i. e., if it was at the destination point) there would be no diversion within the meaning of Item 150 of MBT No. 1. (Id.).

■ The question not resolved in the liability phase, but raised before the commissioner in the Rule 131(c) proceedings, is whether there is a diversion when, after the shipment has arrived at the GBL destination point, the carrier is directed by the transportation officer to deliver the shipment to a residential address (or other specific location) in a city near to but different from the town or city in which the military installation shown on the GBL is located. For example, the destination shown on the bill of lading for shipment 2 was Hickam Air Force Base (AFB), Hawaii, which the evidence shows to be located in Honolulu, Hawaii. When the carrier, as required by the GBL, notified the transportation officer at Hickam AFB of the arrival of the shipment, the plaintiff was directed to deliver shipment 2 to the property owner at a residential address located in Pearl City, Hawaii, approximately 10 miles distant from Hickam AFB. Plaintiff argues that on these facts a diversion of the shipment was ordered by the transportation officer and accomplished by plaintiff, compensable under Item 150D (in Supplement 8) of MBT No. 1. Plaintiff seeks the flat diversion fee of $5 plus a diversion mileage charge.

The commissioner denied plaintiff's claim for diversion compensation on shipment 2 (and similar claims respecting shipments 5, 16, 21, 23, 24, and 28). The commissioner concluded that a diversion would not occur when plaintiff was directed to deliver a shipment to a residential address in a town or city within a "reasonable commuting distance" of the military installation designated on the GBL as the destination.

However, subsequent to the time the commissioner filed his report on the Rule 131(c) proceeding in this case, we resolved a question substantially identical to the issue plaintiff raises with respect to shipment 2 in Global Van Lines, Inc. v. United States, 456 F.2d 717, 197 Ct.Cl. 575 (1972) (hereinafter referred to as *Global*). In *Global* the carrier claimed diversion compensation on shipment 6940, for which the destination shown on the GBL was Maxwell Air

Force Base, Montgomery, Alabama. When the carrier notified the transportation officer that the shipment had arrived in Montgomery, the transportation officer ordered the carrier to deliver the shipment to the property owner at a residential address located in Prattville, Alabama. Prattville is located approximately 10 miles distant from Montgomery. We determined that the direction to the carrier to deliver the shipment to the owner's residence in Prattville, when performed, effected a diversion of that shipment. We rejected the Government's contention that before there could be a diversion there must be a change in the carrier's manner of handling a shipment, because that assertion is inconsistent with the definition of diversion (discussed *supra*) contained in defendant's own regulations. We also rejected the trial commissioner's determination that a diversion would not occur if the carrier was directed to deliver a shipment to a residential address in a city within a "reasonable commuting distance" of the military installation named on the GBL. We held that such a concept found no support in the applicable tariffs or regulations and presented too indefinite a standard for application to the varied situations presented by movements of household goods under Government bills of lading. (456 F.2d at 722–728, 197 Ct.Cl. at 586–597.) Turning to defendant's regulations (the same as are applicable in the instant case) we found that the term "destination" means a specific city in a specific state or country. (456 F.2d at 726, 197 Ct.Cl. at 593.) Since a diversion occurs when there is an ordered change in the destination, we concluded that when the carrier is ordered to deliver the shipment, after arrival at the destination, to a residence located in a town or city different from, albeit near to, the city in which the military installation shown on the GBL is located, a diversion compensable as an additional service (under the applicable tariff or tender) occurs. (456 F.2d at 728, 197 Ct.Cl. at 597.)

We conclude that our decision regarding shipment 6940 in Global is in all respects controlling in the instant proceeding with respect to shipment 2 (and similar shipments). Although shipment 6940 was not governed by the terms of Military Basic Tender No. 1, there is nothing in MBT No. 1 that serves to distinguish *Global* from this case.

Defendant contends that we should determine, with respect to all shipments delivered under the terms of MBT No. 1, that no diversion compensable under Item 150 would occur if delivery was ordered (without SIT) to a residence located within a 30-mile radius of the installation noted as the destination on the GBL. This argument rests upon an agreement entered into in the fall of 1965 between plaintiff (and other carriers) and the Government. The new agreement was specifically applicable to shipments controlled by the terms of MBT No. 1, which moved after October 1, 1965, and it provided that no Item 150 diversion would occur because of ordered deliveries to residential addresses within said 30-mile radius of destination. Although the shipments here at issue were delivered prior to October 1, 1965, defendant maintains that the later agreement represented an interpretation by the parties of the terms "destination" and "diversion" as used in Item 150 that gave effect to the intent of the parties from the time MBT No. 1 first went into effect; and that the court should apply the 30-mile free delivery radius concept even to shipments occurring prior to October 1, 1965, as representing the best evidence of the meaning of Item 150 throughout the course of dealings under MBT No. 1. Defendant's argument is untenable. The evidence is persuasive that defendant imposed the 30-mile free delivery radius on the carriers who were parties to MBT No. 1, by letter dated August 20, 1965. The letter required them to concur in this purported "interpretation" of Item 150 prior to October 1, 1965, or risk the loss of Government business. Plaintiff submitted

its concurrence under protest and solely to avoid the loss of Government business. There is no reasonable basis upon which it can be concluded that the parties intended from the time MBT No. 1 was first issued that it was to be interpreted as defendant now argues.

We conclude, therefore, that with respect to shipment 2 a diversion compensable under Item 150D was accomplished when plaintiff delivered the shipment to the owner's residence in Pearl City, Hawaii, 10 miles distant from Hickam AFB. Plaintiff is entitled for shipment 2 to additional compensation totalling $64.94 (the $5 standard diversion charge set forth in Item 150D, plus a diversion mileage charge of $59.94).

Shipment 24 presents facts very similar to those present with respect to shipment 2. Therefore, plaintiff is entitled to additional compensation for shipment 24, under the terms of Item 150C (in Supplement 4) of MBT No. 1, in the amount of a $42.26 diversion mileage charge, plus the standard $5 diversion fee. (See finding 24.)

■ Shipment 16, although similar to shipments 2 and 24, presents an additional complication. The destination stated on the GBL for shipment 16 was the Brooklyn Army Terminal, Brooklyn, New York. After shipment 16 had arrived at the port of debarkation (New York, New York), but prior to notifying the transportation officer at the Brooklyn Army Terminal of the arrival, plaintiff's agent cleared the shipment through customs and removed the shipment to the agent's facility at Kearny, New Jersey. Thereafter, the transportation officer ordered the shipment delivered to a residential address in Forest Hills, New York. Plaintiff claims that for shipment 16 it is entitled, in lieu of the line-haul charge previously paid for the shipment from origin (Germany) to New York, to a line-haul charge computed at the applicable single factor rate for transportation from origin to points in New Jersey, plus the appropriate diversion and diversion mileage charge for a

delivery from Kearny, New Jersey to Forest Hills, New York. The evidence is devoid, however, of any indication that the removal of the shipment from the port of New York to Kearny, New Jersey, was ordered by defendant or was performed for any reason other than plaintiff's own convenience. Rather, the evidence is persuasive that within the meaning of Item 150B (in Supplement 2) of MBT No. 1 the shipment was diverted from Brooklyn Army Terminal to the residence in Forest Hills, New York, prior to the time the shipment had left the port of debarkation. (*See* 426 F.2d at 337–338, 192 Ct.Cl. at 91–94.) We conclude that defendant properly compensated plaintiff for a line-haul shipment from origin to New York. Since the port of New York is the "normal port" for shipments to Forest Hills, New York, plaintiff is entitled to the $5 diversion fee (which it has already received) for a diversion from Brooklyn Army Terminal to Forest Hills, but not to any diversion mileage charges. (*See* 426 F.2d at 333–337, 192 Ct.Cl. at 85–91.)

■■ Shipments 23 and 28 present a variation of the situation presented by shipment 2, the so-called "double diversion" situation. Shipment 23 is illustrative; it originated in Hawaii, with the destination designated on the GBL being Ft. Leonard Wood, Missouri. When notified that the shipment had arrived at destination, the transportation officer at Ft. Leonard Wood ordered the shipment diverted to Ft. Carson, Colorado, a distance of about 804 miles. For its own convenience, plaintiff actually routed the shipment to its agent's facility located in Colorado Springs, Colorado, some 4 miles distant from Ft. Carson. When the agent notified the transportation officer at Ft. Carson of the arrival of shipment 23, the agent was instructed to deliver the shipment to the owner's residence in Colorado Springs. Plaintiff argues that it is entitled to compensation for two diversions with respect to shipment 23, to be compensated under Item 150C. Thus, plaintiff claims that

there was an initial diversion of 804 miles from Ft. Leonard Wood to Ft. Carson and a second diversion from Ft. Carson to the residence in Colorado Springs. We are persuaded, however, that plaintiff is entitled to compensation for only a single diversion for shipment 23, a diversion from Ft. Leonard Wood, Missouri, to Colorado Springs, Colorado (a distance of 800 miles). Item 150C (in Supplement 4) of MBT No. 1 states in part:

> Upon receipt of diversion instructions *and such is accomplished,* a $5.00 Diversion Charge will apply in addition to the following provisions, rates and charges: * * *. [Emphasis added.]

It is further to be noted that in the liability phase of this case we stated that the parties may not ignore the factual context of the contract provisions (326 F.2d at 340, 192 Ct.Cl. at 97); and we think that the clear intent of the parties in Part II of MBT No. 1 is that the carrier will be compensated for additional services that are ordered or required by defendant, or are necessary for the carrier to carry out what is ordered or required, as when the diversion is *actually accomplished* by the carrier. We do not believe that MBT No. 1 can reasonably be read as intending to compensate a carrier for two diversions in a situation where the carrier does not follow the routing instructions but proceeds to route a shipment directly from the point of diversion to the destination point at which is located the property owner's residence. Such a claimed diversion is a fictitious or paper diversion, which was not actually accomplished. It is concluded, therefore, that the carrier should be compensated for the one diversion "accomplished" within the meaning of Item 150C. Therefore, the carrier is entitled to the standard $5 diversion fee plus an additional $566.83 as diversion mileage for 800 miles with respect to shipment 23 (less $551.38 previously paid by defendant on account of this diversion).

Shipment 28 is factually quite similar to shipment 23. We hold, for the reasons set forth above, that with regard to shipment 28 plaintiff accomplished one diversion of that shipment: from the port of debarkation (San Francisco) to the owner's residence in Sherman, Texas (and not to Perrin Air Force Base, Texas). The total diversion compensation to which plaintiff is entitled for shipment 28 is the standard $5 fee plus $455.84 for mileage (based on 1,750 miles) under Item 150. (*See* finding 28.)

▆ Shipments 5 and 21 present another variation on the factual situations heretofore discussed. Both were diverted from the destinations noted on the respective GBL's to storage facilities located in different (but nearby) cities for purposes of "non-temporary" (or long-term) storage as provided on both GBL's. In both cases the non-temporary storage facilities were specifically designated by defendant. In the *Global* case, *supra,* 456 F.2d at 729, 197 Ct.Cl. at 598, the Government conceded that there was a diversion where a shipment was ordered into non-temporary storage in a facility selected by the Government and located in a city other than the destination city. We see no reason to distinguish a situation in which the defendant orders the carrier to deliver a shipment to a residence in a city near to but different from the destination set forth on the GBL from a situation in which the defendant orders the carrier to deliver the shipment to a particular warehouse in another city. For the reasons set forth with respect to shipment 2, *supra,* we conclude that shipment 5 was diverted within the meaning of Item 150 from the GBL destination point (the Presidio of San Francisco, California) to the Von Der Ahe Van Service warehouse in Berkeley, California, and that plaintiff is entitled to a $5 diversion charge plus a mileage charge of $61.05 for the diversion of shipment 5. (*See* finding 5.) We also find that shipment 21 was diverted within the meaning of Item 150B (in Supplement 2) of MBT No. 1 from the GBL destination point (Brooklyn Army Receiving Terminal, Brooklyn,

New York) to the non-temporary storage warehouse in Jersey City, New Jersey. Therefore, plaintiff is entitled to recover $5 as a diversion fee plus a diversion mileage charge of $18.89 for shipment 21. (*See* finding 21.)

## II. *The "Diversion to SIT" Claims*

Another issue considered by the court in the liability phase of this case was whether there was a diversion of a shipment, within the meaning of Item 150 of MBT No. 1, when, after the transportation officer at the GBL destination point had been notified of the arrival of the shipment, the transportation officer ordered the carrier to place the shipment in storage-in-transit (as authorized on the GBL) until such time as it became possible to furnish the carrier with specific delivery instructions. In the typical case, it should be noted, although all SIT warehouses must be approved by the Government for such use, the transportation officer will not direct the carrier to utilize any particular warehouse for a given shipment, but will leave that choice to the discretion and convenience of the carrier.

Shipment 4 was considered by the court in the liability phase as presenting an apt illustration of this issue. Shipment 4 originated in Rhode Island, U.S.A., and the destination noted on the GBL was Aschaffenburg, Germany; SIT at destination was authorized on the GBL for 90 days. Plaintiff notified the transportation officer at Aschaffenburg of the arrival of shipment 4, and the latter ordered the carrier to place the shipment into SIT pending receipt of delivery instructions. Plaintiff's agent selected as the site for SIT the agent's warehouse in Darmstadt, Germany. Plaintiff sought an Item 150 diversion fee and mileage payment for the movement of the goods from Aschaffenburg to Darmstadt. We held that the claim should be denied. We noted that under

the single factor rate for the line-haul movement of the goods, the Government is entitled to one pick-up at origin, one delivery at destination, and to all the transportation in between. The initial delivery at destination would not be accomplished until the shipment was placed into SIT as ordered by the transportation officer. Yet the transportation officer merely required SIT at destination; the decision to effect storage at Darmstadt was solely that of plaintiff. The destination point never ceased to be Aschaffenburg. Therefore, we concluded that there was no diversion to SIT of shipment 4. 426 F.2d at 338–341, 192 Ct.Cl. at 94–98.) [1]

Nonetheless, plaintiff contends in these Rule 131(c) proceedings that there were diversions to SIT in connection with shipments 9, 11, 30, and 38, all of which, it says, can be distinguished from the situation presented with regard to shipment 4.

It is true that shipments 9, 11, 30, and 38 each present some factual differences from shipment 4. However, as will be discussed, *infra*, we believe that the principles applicable to the disposition of the shipment 4 claim are controlling with regard to the claims on shipments 9, 11, and 30. Shipment 38 presents quite a different situation, and we have determined that plaintiff's claim thereon has merit.

■ Shipment 9 originated in Hawaii, and the destination designated on the GBL was Richmond, California. Plaintiff's agent was to inform the transportation officer at Oakland Army Terminal of the arrival of the shipment. After notification, the transportation officer ordered the shipment diverted to Clinton, Maryland (2,839 miles from Richmond, California). While the shipment was being delivered to Clinton, plaintiff was further instructed to place shipment 9 in SIT. Plaintiff selected

---

[1]. In the *Global* case, *supra*, the carrier withdrew from the consideration of the court five claims regarding alleged diversions to SIT, based on our disposition of

the shipment 4 issue in the liability phase of the instant case. (456 F.2d at 728–729, 197 Ct.Cl. at 597.)

its agent's warehouse in Hyattsville, Maryland (18 miles distant from Clinton, Maryland) for the storage-in-transit of shipment 9. With respect to shipment 9, plaintiff seeks compensation under Item 150B for two diversions—the first from Richmond, California, to Clinton, Maryland, and the second from Clinton to Hyattsville, Maryland. It is noteworthy that if plaintiff prevails on this issue, it will incur a reduction in the amount of its recovery. This is because the Government is willing to pay plaintiff $51.25 for the placing of the shipment in SIT at Hyattsville whereas the diversion fee, plus mileage, plaintiff seeks for the alleged diversion from Clinton to Hyattsville would total only $30.75, and would displace the former amount. However, should plaintiff prevail on its theory, it will recover greater amounts on other shipments. We do not adopt plaintiff's position, for we think that shipment 9 is not distinguishable from shipment 4 merely because the direction to SIT occurred with respect to a diverted destination rather than at the initial destination point indicated on the GBL. SIT is authorized at either location; Clinton, Maryland, was, following the initial diversion, the destination, and plaintiff, not defendant, selected Hyattsville as the site for the SIT of the shipment. Consequently, we conclude that plaintiff is entitled to payment of a $5 diversion fee, plus diversion mileage in the amount of $643.50 (of which it has already received $639.60), for the single diversion from Richmond, California, to Clinton, Maryland, but that plaintiff is not entitled to receive any diversion compensation under Item 150B for delivering shipment 9 to Hyattsville.

■ The facts surrounding the alleged diversions to SIT of shipments 11 and 30 are quite similar to the facts of shipment 9 and do not require extended discussion. Shipment 11 was subject to an admitted diversion from New Orleans, Louisiana, to Hazard, Kentucky (as discussed at length in part VII of this opinion, *infra*). The shipment was then ordered into SIT; plaintiff selected its agent's warehouse in Williamson, West Virginia, for that purpose. Plaintiff is not entitled to any diversion compensation under Item 150B for placing shipment 11 in SIT at Williamson, West Virginia. (*See* finding 11.) Shipment 30 was admittedly diverted from the port of debarkation (New York, New York) to Arcola, Illinois, and was ordered into SIT. The warehouse of plaintiff's agent in Decatur, Illinois, was selected. Plaintiff will be fully compensated under Item 150 for the diversion from New York to the diverted destination point, Arcola. (*See* 426 F.2d at 337, 192 Ct.Cl. at 91.) The movement of the shipment to a warehouse in Decatur was entirely the choice of plaintiff, and it is not entitled to diversion compensation under Item 150 for the claimed diversion from Arcola to Decatur, Illinois. (*See* finding 30.) As to shipments 9, 11, and 30, we do not deem it relevant that plaintiff may have routed the shipments from the points of diversion directly to the locations of the SIT warehouses, thus bypassing the diverted destinations altogether, *e. g.*, moving shipment 30 from the port of debarkation, New York, New York, directly to the SIT warehouse in Decatur, Illinois, and never actually moving shipment 30 to Arcola, Illinois. Following the diversion order, Arcola, Illinois, was the destination point for shipment 30; SIT was ordered but the Decatur, Illinois, site was selected solely by plaintiff. Therefore, regardless of the actual routing of shipments 9, 11, and 30 by plaintiff, we hold that Item 150 diversion compensation is payable for the mileage to the diverted destination designated by the Government from the point of diversion and not from the point of diversion to some other location selected by the carrier for SIT. Consistent application of MBT No. 1 requires this conclusion whether the actual mileage performed is more or less than the mileage between the specifically ordered points.

Shipment 38 originated in Kansas, with the destination designated on the GBL being Ft. Kobbe in the Canal Zone.

SIT not to exceed 90 days was authorized at destination, but the carrier was to notify the transportation officer at Ft. Kobbe of the arrival of shipment 38. After receiving such notification, the transportation officer ordered the shipment placed in SIT at a Government storage facility located in Curundu in the Canal Zone, some 30 miles distant from Ft. Kobbe. Plaintiff seeks the $5 diversion fee plus mileage charge of $63 for the alleged diversion of shipment 38 from Ft. Kobbe to SIT at Curundu under Schedule A of Item 150D (in Supplement 8) of MBT No. 1. It is obvious that since defendant selected the SIT facility for shipment 38, shipment 38 is readily distinguishable from shipments 4, 9, 11, and 30. However, defendant asserts that while plaintiff is entitled to additional compensation for delivering shipment 38 to SIT in Curundu, such compensation is payable under Item 135A (in Supplement 4) of MBT No. 1. Item 135A provides, in pertinent part:

> At the option of the destination transportation or shipping officer, when storage in transit shipments are delivered to storage in government facilities *at destination,* carrier will perform delivery and unpacking service within a 50 mile radius * * * of the point of storage without additional charge.
>
> * * * * * *
>
> *The above is subject to a charge of one dollar ($1.00) per cwt. for delivery to storage in government facilities,* which charge is in addition to the land transportation rate when delivery is beyond a 50 mile radius * * * of the point of storage. [Emphasis added.]

Thus, defendant asserts that plaintiff should receive, for delivering shipment 38 to SIT in the Government's storage facilities at Curundu, 30 miles from the destination named in the GBL, only the $1 per hundredweight specified "for delivery to storage in government facilities" in Item 135A (or a total of $16.50), but no diversion compensation

under Item 150D. We note, however, that Item 135A refers to Government storage facilities "at destination", and that the Government warehouse selected by defendant was 30 miles from destination. We are of the opinion, therefore, that shipment 38 was diverted, within the meaning of Item 150D, from Ft. Kobbe to Curundu, and that plaintiff is entitled to receive the standard diversion charge of $5 plus a diversion mileage charge (for 30 miles) of $63. If there is any ambiguity in Item 135A, it should be resolved against the defendant. Since plaintiff would have received the additional compensation of $1 per hundredweight for delivering shipment 38 to the Government warehouse at destination, plaintiff should also receive the above-referenced $16.50 for performing the same service at Curundu, the diversion destination. Plaintiff is thus entitled to an additional $84.50 for delivering shipment 38 to the defendant's facility at Curundu ($68 under Item 150D plus $16.50 under Item 135A). Plaintiff's claim for additional compensation for delivering shipment 38 out of SIT to the owner's residence at Ft. Kobbe is discussed in part IX of this opinion, *infra.*

### III. *The Single-Factor Rate*

A question has been raised by the plaintiff in the proceedings under Rule 131(c) as to whether, when a shipment from overseas arrived at the GBL destination in the United States, and the carrier, upon being instructed by the destination transportation officer to place the shipment in SIT, placed the shipment in a SIT warehouse located in a State different from the one in which the GBL destination was located, the proper single-factor rate to apply in computing the line-haul charge is the single-factor rate from origin to the State of the GBL destination or the single-factor rate from origin to the State of the SIT warehouse. Shipments 6, 12, 15, and 17 involve this problem.

Shipment 6 originated in Germany and was consigned to the property own-

er in care of the port transportation officer at the Army Terminal Command in Brooklyn, New York. The GBL authorized SIT at destination for not to exceed 90 days, and instructed the plaintiff to notify the destination transportation officer prior to placing the shipment in storage. When the plaintiff notified the transportation officer at the Brooklyn Army Terminal that shipment 6 had arrived, the plaintiff was ordered to place the shipment in SIT; and the plaintiff accordingly placed shipment 6 in its agent's warehouse at Kearny, New Jersey.

The plaintiff claims in the Rule 131(c) proceedings that, in lieu of the line-haul charge of $632.40 previously paid, based on the single-factor rate of $30 applicable from origin to New York, the plaintiff is entitled to a line-haul charge of $647.16, based on the single-factor rate of $30.70 applicable from origin to New Jersey.

The claim referred to in the preceding paragraph was not asserted by the plaintiff—and this particular issue was not otherwise presented by the plaintiff—in its requested findings of fact and brief submitted to the commissioner on the liability phase of the case, and it was not considered by the court in the decision of May 15, 1970.

■ In a situation where a separate determination is to be made on liability under Rule 131(c), formerly Rule 47(c), it is incumbent upon a party to present in the initial trial proceedings *all* the issues of law and fact relating to the right of such party to recover. After a separate determination on liability has been rendered, it is too late for a party, in the subsequent proceedings to determine the amount of the recovery, to present for consideration an entirely new issue affecting liability that was not raised in the initial proceedings. For this reason, the plaintiff's attempt to present in the proceedings under Rule 131(c) the new issue as to whether the single-factor rate from origin to New Jersey, rather than the single-factor rate from origin to New York, should be applied in computing the amount of the line-haul charge on shipment 6 is untimely and should be disapproved for that reason.

■ The conclusion stated in the preceding paragraph makes it unnecessary to consider the merits of this particular claim. However, it may appropriately be noted that the decision to place shipment 6 in a SIT warehouse located in New Jersey, instead of one located in New York, was made solely by the plaintiff, that such placement was not requested by the defendant, and that it did not confer upon the defendant any greater benefit than would have been derived from the placement of shipment 6 in a SIT warehouse located in New York, the destination State designated in the GBL, which was the transportation contract between the parties. A contract involves mutuality, and it would be inconsistent with this principle to permit the plaintiff to increase the amount of the line-haul charge merely by selecting unilaterally a SIT warehouse located in a State different from the destination State agreed upon by the parties in the GBL.

The reasoning previously set out in this part III of the opinion concerning the plaintiff's claim as to shipment 6 is equally applicable to the plaintiff's similar claims in connection with shipments 12, 15, and 17. Consequently, all of these claims should be rejected.

## IV. *Loss of Containers*

In the liability phase of the case, the court held that the plaintiff was entitled to compensation for the loss of its containers when a shipment was being transported in carrier-owned containers and the defendant ordered that such shipment be delivered in the carrier-owned containers for non-temporary storage in a warehouse operated by a company other than the carrier or its agent, or the defendant ordered that the shipment be delivered to another carrier for further transportation in the first carrier's containers, with the result that

the first carrier lost possession of its containers and never recovered them (426 F.2d at 345–346, 192 Ct.Cl. at 106–108).

Claims for the loss of containers have been presented in connection with shipments 7, 29, and 35.

There is no evidence in the record concerning the age of the containers that were used for these particular shipments, the extent to which they had been used prior to these shipments, or their condition at the time when the plaintiff lost possession of them due to the directives issued by the defendant. However, the evidence in the record does show that such containers were actually being used for the transportation of household goods on overseas movements, and it is reasonable to infer that they were in suitable condition for that purpose.

There is also evidence in the record to the effect that the small containers (66 cubic feet or less) used by carriers of household goods have an average value of $25, that medium-sized containers (67–126 cubic feet) have an average value of $40, and that large containers (137–252 cubic feet) have an average value of $50. While this sort of evidence as to value is not entirely satisfactory, it is the best that is available to the court in the present case.

As this court said in Dale Construction Company v. United States, 168 Ct. Cl. 692, 729 (1964), "where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary." Therefore, in order that the defendant may not completely escape responsibility for the legal wrong that was done to the plaintiff in connection with the loss of its containers, the court would be justified in granting relief to the plaintiff on the basis of the general evidence as to the average value of con-

tainers referred to in the preceding paragraph.

On such basis, the three containers that were lost in connection with shipment 7 had a value of $125, the container that was lost in connection with shipment 29 had a value of $25, and the container that was lost in connection with shipment 35 had a value of $40. Accordingly, the plaintiff's claims in these respective amounts for the loss of containers should be allowed.

## V. The Item 145 Mileage Problem

An issue has been raised with respect to the computation of mileage under Item 145 of MBT No. 1 in connection with shipments 15, 18, and 31. Each involves a situation in which a shipment had arrived at the destination point shown on the GBL and was ordered into storage-in-transit. Subsequently each shipment was ordered delivered out of SIT to a new and distant destination point, in each case a military installation. Upon notification that the shipments had arrived at or near the new destinations, the transportation officers ordered the shipments delivered either to a residential address in a city near to but different from the city in which the base was located (shipments 15 and 31); or to an additional period of SIT (shipment 18).

 In the liability phase we determined that any delivery by the carrier from SIT (at least prior to June 1, 1965) whether to a local address or a distant point, is compensated under Item 145 of MBT No. 1. (426 F.2d at 352–354, 192 Ct.Cl. at 119–122; *see also* Routed Thru-Pac, Inc. v. United States, 401 F.2d 789, 185 Ct.Cl. 428 (1968). The precise question presented in connection with shipments 15, 18, and 31 is whether Item 145 mileage is to be computed according to the literal instructions of the defendant, or according to the actual routing by plaintiff.[2]

2. This question bears some similarity to questions presented by shipments 9 and 30 (*see* pt. II of this opinion) and by ship-

ment 23 (*see* pt. I of this opinion). Those questions involved mileage computation under Item 150, however, and because

Shipment 15 originated in France, and the destination noted on the GBL was Brooklyn Army Terminal, Brooklyn, New York. After arrival at destination, the shipment was ordered into SIT; this was accomplished at the warehouse of plaintiff's agent at Jersey City, New Jersey. Subsequently, defendant ordered shipment 15 delivered to Tinker Air Force Base, Oklahoma, a distance of 1,451 miles from Jersey City. When plaintiff's agent notified the transportation officer at Tinker AFB that shipment 15 had arrived at Oklahoma City, Oklahoma, the transportation officer ordered delivery of the shipment to the owner's residence in Midwest City, Oklahoma, located about 16 miles from Tinker AFB. The question is whether plaintiff is entitled to compensation under Item 145B (in Supplement 4) of MBT No. 1 based on a total mileage of 1,467 miles (from Jersey City to Tinker AFB to Midwest City) as plaintiff contends, or based on a total mileage of 1,451 miles (which is the direct line distance from Jersey City to the residence in Midwest City) as defendant contends. Unlike Item 150, Item 145B does not refer to the terms "destination" or "diversion", but refers rather to "location of warehouse" and "point of pickup or delivery". We are of the opinion that the only reasonable interpretation of Item 145B is that it provides compensation for actual delivery mileage required by the carrier to comply with the delivery instructions of the defendant. If the carrier had in fact routed the shipment directly from Jersey City to the residence in Midwest City, it would fairly be entitled to compensation only for the direct distance mileage of 1,451 miles, whether or not there had been an intermediate direction "on paper" to Tinker AFB. Here, however, the carrier was unable to avoid circuitous mileage, because the delivery instruction to the residence in Midwest City was not tendered by the transportation officer at Tinker

AFB until the shipment had arrived in Oklahoma City (in which the base is located). Therefore, plaintiff is entitled to compensation under Item 145B for a delivery from SIT of 1,467 miles (or a total amount of $1,032.03 for that delivery).

Shipment 31 presents, in effect, the converse of the shipment 15 situation. Shipment 31 originated in the Philippines, and was initially destined for Oakland, California, where it was placed into SIT upon arrival. Somewhat later the shipment was ordered to Blytheville Air Force Base, Arkansas, and plaintiff routed the shipment to its agent's facility in Blytheville, Arkansas. Upon notification of the arrival of shipment 31, the transportation officer at Blytheville AFB ordered delivery to the owner's residence in Blytheville. Plaintiff claims mileage compensation under Item 145 based on a distance of 2,190 miles from Oakland, California, to Blytheville AFB, plus an additional 4 miles from the base to the residence. The claim is denied. For the reasons set forth with respect to shipment 15, we conclude that plaintiff is entitled only to the direct distance mileage actually performed by plaintiff to effect delivery of shipment 31, 2,186 miles from Oakland, California, to Blytheville, Arkansas. (The amount of plaintiff's entitlement for this delivery from SIT of shipment 31 is discussed in part VI of this opinion, *infra.*)

Shipment 18 presents a third variation on this Item 145 mileage dilemma. Shipment 18 originated in Germany, with a GBL destination of Ft. Riley, Kansas. Upon arrival at destination, the shipment was placed into SIT at the facility of plaintiff's agent located in Junction City, Kansas. Thereafter, the transportation officer at Ft. Riley ordered the shipment delivered to Ft. Sheridan, Illinois, located 650 miles from Junction City, Kansas. Plaintiff's agent routed the shipment to Des Plaines, Illinois, some 17 miles from Ft. Sheridan,

the language of, and the service provided for in, Item 145 is distinct from Item 150, we believe that the problems involved

with shipments 15, 18, and 31 must be separately considered.

and notified the transportation officer at Ft. Sheridan of the arrival of shipment 18. The transportation officer ordered the shipment into SIT. Plaintiff's agent selected its warehouse in Des Plaines for the SIT. Plaintiff seeks compensation under Item 145A (in Supplement 1) of MBT No. 1 based on a total mileage of 667 miles (from Junction City to Ft. Sheridan to Des Plaines), while defendant urges that the correct mileage should be the direct distance mileage from Junction City to Des Plaines, 639 miles. Our trial commissioner chose a third figure, the 650 miles from Junction City to Ft. Sheridan. We believe that the last figure is the correct one, because the delivery point designated by defendant was Ft. Sheridan, Illinois. As was the case with respect to shipments 4, 9, 11, and 30 (discussed in part II of this opinion, *supra*), plaintiff (or its agent) selected the site for SIT. Although those shipments presented questions arising under Item 150, it is our opinion that the test under Item 145 is what the carrier was *actually required* to do in order to comply with the delivery instructions issued by defendant. Where the carrier is given an election to choose the SIT facility, compensation under Item 150 or Item 145, in terms of mileage, is payable to the destination or delivery point specifically designated by defendant. Therefore, plaintiff is entitled to compensation under Item 145A based on mileage of 650 miles, or to a total of $312.18 for delivery of shipment 18 out of SIT at Junction City to SIT near Ft. Sheridan.

## VI. *The Rate Under Item 145*

Shipments 12 and 31 present an issue with respect to the determination of the proper rate payable under Item 145 (or under the identical language of Item 145 A in Supplement 1 of MBT No. 1) when a shipment weighing between 500 and 1,000 pounds was delivered to a point more than 50 miles distant from the SIT warehouse in which storage-in-transit had been accomplished.

As noted in part V of this opinion, plaintiff is entitled to compensation for shipment 31 for a delivery from SIT of 2,186 miles under Item 145. Shipment 31 weighed 795 pounds. Items 145 (and 145A) provide in pertinent part as follows:

### APPLICATION

Rates are in dollars and cents per hundred pounds based on actual weight subject to 500 pound minimum and apply on shipments when released to a value not exceeding 30 cents per pound per article.

Rates apply depending upon location of warehouse as shown below, on pick-up or delivery of storage-in-transit shipments when point of pick-up or delivery and warehouse are both located within the same municipality or within a distance of 50 miles or less * * *.

For rates to apply when points are not within the same municipality or not within a distance of 50 miles or less * * *, add to the rates shown below, 50¢ per cwt. for each 20 miles or fraction thereof in excess of 50 miles.

Break Point indicates weight at which a lower charge develops by use of lowest weight and applicable rate in next higher weight bracket.

\* \* \* \* \* \*

SCHEDULE C: WHEN WAREHOUSE IS LOCATED AT ANY POINT IN THE FOLLOWING STATES OR AREAS:

CALIFORNIA: The City and County of San Francisco and including the Counties of Alameda, Contra Costa, Marin, Napa, San Mateo, Santa Clara, Solano and Sonoma.

\* \* \* \* \* \*

NEW JERSEY: Any point within the State.

\* \* \* \* \* \*

500 lbs. to 999 lbs. incl. (Break Point Weight 675 lbs.) . . . . . . . $4.45
1,000 lbs. to 1,999 lbs. incl. (Break Point Weight 1,668 lbs.) . . . . . . . . . . . . . . . . . . . . . . . 3.00

The dispute involves the proper application of the rate formulae when the shipment exceeds the Break Point Weight for its weight category. It is undisputed that Item 145 requires a two-stage rate computation, the first for the delivery from SIT over a distance up to 50 miles, and the second stage for all distances in excess of 50 miles. For a delivery up to 50 miles, or for the first 50 miles of a delivery distance greater than 50 miles, the rate is a flat rate per hundredweight according to weight category. The rate for the 500 to 999-pound category is $4.45 per hundredweight; the applicable rate for the 1,000 to 1,999-pound category is $3 per hundredweight. The parties agree that since shipment 31 (795 pounds) exceeds the Break Point Weight for its category (675 pounds), the rate for the first 50 miles of the 2,186-mile delivery from SIT is computed by applying the $3 per hundredweight for the 1,000 to 1,999-pound category to the minimum weight for that category (1,000 pounds). Thus, the proper compensation for the first 50 miles is $30, a *lower rate* than the $35.-38 a shipment of 795 pounds would earn but for the Break Point rule of Item 145. Item 145 provides, for all distances in excess of 50 miles, a rate of $.50 per hundredweight per 20-mile segment (or fraction of 20 miles) of the distance in excess of 50 miles, which for shipment 31 is 2,136 miles (or 107 segments of 20 miles or a fraction thereof). Plaintiff argues, and the commissioner agreed, that once a shipment is found to exceed the Break Point Weight, the rate of $.50 per hundredweight per 20-mile segment is applied to the minimum weight of the next highest weight category just as the flat rate for the first 50 miles was applied. Plaintiff's position is that Item 145 is intended to achieve a more favorable rate for defendant, on shipments exceeding the Break Point Weight for their categories, only for the first 50 miles, but is intended to give the carrier a more favorable rate for shipments exceeding the applicable Break Point

Weight if the delivery from SIT is for a distance greater than 50 miles. Thus, plaintiff claims compensation for shipment 31 of $535 for the last 2,136 miles of the delivery, or a total of $565 for the entire 2,186-mile delivery from SIT. Plaintiff also contends that even if its interpretation of the Break Point rule is not the only reasonable interpretation, at best Item 145 is ambiguous and should be construed to favor plaintiff since defendant drafted the MBT.

■ However, we agree with defendant that the Break Point Weight rule is applicable under Item 145 only for the first 50 miles of the delivery, and that there is no ambiguity on this point. The item clearly states that:

Break Point indicates weight at which *a lower charge develops* by use of lowest weight and applicable rate in the next higher weight bracket. [Emphasis added.]

Clearly this is true only for the first 50 miles, for which Item 145 provides a sliding scale of rates—the higher the weight bracket, the lower the flat rate. A lower rate always develops for shipments exceeding the Break Point Weight by using the lower rate of the next highest bracket as applied to the lowest weight for that bracket. However, for distances over 50 miles the rate per hundredweight per 20-mile segment is always $.50, regardless of weight category; a lower rate cannot develop by applying that rate to a weight in excess of the actual weight of a shipment. The rate of $.50 per hundredweight over 107 20-mile segments for a 795-pound shipment results in compensation for the last 2,136 miles of the delivery from SIT totalling $425.33. When this is added to the $30 payable for the first 50 miles, compensation for the total delivery of 2,186 miles totals $455.33. Since the clear (and only) expressed purpose of the Break Point rule is to develop a lower charge for shipments exceeding the Break Point Weights for their weight bracket, it is concluded that the Break

Point formula is applicable for the first 50 miles of a delivery from SIT, and that the actual weight is to be used for rate computation for distances over 50 miles. To hold otherwise, would allow plaintiff to collect a higher rate under the Break Point rule than plaintiff could collect by using the actual weight of the shipment. Such a result would defeat the stated purpose of the rule. Therefore plaintiff is entitled to compensation under Item 145 in the amount of $455.33 for the delivery from SIT of shipment 31 from Oakland, California, to Blytheville, Arkansas.

Shipment 12 was delivered from SIT in Jersey City, New Jersey, to the owner's residence in Picher, Oklahoma, a distance of 1,255 miles; shipment 12 weighed 813 pounds. For the reasons set forth with respect to shipment 31, it is concluded that the delivery from SIT of shipment 12 is to be compensated in the amount of $30 for the first 50 miles (under Item 145A of Supplement 1 of MBT No. 1), and in the amount of $247.97 for the additional 1205 miles, or a total amount of $277.97. (*See* finding 12.)

### VII. *The Mode 5 Problem*[3]

▆▆ Shipment 11 originated in the Canal Zone and was consigned to the transportation officer at the Army Transportation Terminal Command in New Orleans, Louisiana. Shipment 11 moved in Mode 5 ("Door-to-Door Container Government (MSTS)") for which, as provided in defendant's regulations, the ocean portion of the transportation is furnished and paid for by defendant. The plaintiff provides the additional land transportation from the

port of debarkation to points within the continental United States. While shipment 11 was still in the port of debarkation, New Orleans, defendant's transportation officer ordered the shipment diverted to Hazard, Kentucky, with instructions for plaintiff to notify the transportation officer at Lexington Signal Depot, Kentucky, of the shipment's arrival.[4]

There is no dispute that when defendant ordered shipment 11 to Hazard, Kentucky, there was a diversion compensable under Item 150B (in Supplement 2) of MBT No. 1. The question involves the manner of computation.

Plaintiff contends that for purposes of diversion compensation under Item 150B, MBT No. 1 draws no distinction between shipments moving in Mode 4 (for which plaintiff provides all the transportation from origin to ultimate destination) and Mode 5 shipments. Plaintiff points out that the port of Baltimore, Maryland, rather than the port of New Orleans, would normally be utilized as the port of debarkation for a shipment moving from the Canal Zone to points in Kentucky. Therefore, the diversion of shipment 11 from the original GBL destination (New Orleans) to Hazard, Kentucky, should be compensated under Item 150B like any other shipment diverted to a domestic destination from a port not normally utilized to service the diverted destination. Plaintiff refers us to the discussion of the so-called " 'Normal Port' Diversion Claims" in the liability phase. (426 F. 2d at 333–337, 192 Ct.Cl. at 85–91 (which dealt with shipments moving in Mode 4.)) Under this theory plaintiff

---

3. With respect to this issue, as well as with respect to other issues presented in the Rule 131(c) proceedings, we note that *both* parties have repeatedly sought to reargue points that were thought to have been settled in the liability phase. Where substantially similar questions have been determined in prior litigation, including a prior proceeding in the same case, the court will not consider such arguments unless there

are compelling circumstances that require review of prior holdings. Considerations of judicial economy and orderly disposition of the issues render it desirable that both parties proceed directly to the issues yet undecided and forego a purposeless and time-consuming rehashing of cold matters.

4. The further routing of shipment 11 to SIT at Williamson, West Virginia, is discussed in part II of this opinion, *supra.*

would be entitled, for the diversion to Hazard, Kentucky, to (1) compensation at the applicable single-factor rate from origin (the Canal Zone) to the point of diversion (New Orleans), $18.80 per hundredweight or a total of $327.12; (2) the standard $5 diversion fee; and (3) diversion mileage charges for the 772 miles from New Orleans to the diverted destination (Hazard, Kentucky), a total of $186.53. Thus, plaintiff's total compensation for the movement from the Canal Zone to Hazard, Kentucky, would be in the amount of $518.65. The thrust of plaintiff's claim for shipment 11 is that neither the MBT No. 1 nor our decision on the "normal port" issue creates a logical basis upon which to treat Mode 5 shipments, for Item 150B purposes, in any manner differently than Mode 4 shipments.

■■■ It is undisputed that shipment 11 would normally be governed by the terms of MBT No. 1; and that a diversion of a Mode 4 shipment from New Orleans to Hazard, Kentucky, would be treated under Item 150B as plaintiff suggests. However, defendant argues, and the trial commissioner concluded, that at the time shipment 11 moved in Mode 5 (March 1964) there was a separate agreement between plaintiff and defendant respecting Mode 5 shipments originating in the Canal Zone to the effect that the MSTS ports of New York, Norfolk, or New Orleans (or any of them) would be the "normal ports" for such shipments. The commissioner found that prior to the fall of 1965 there was no contractual understanding between plaintiff and defendant pursuant to which defendant agreed to utilize the MSTS port nearest the GBL destination point as the port of debarkation for a Mode 5 shipment. To the contrary, the evidence showed (*see* findings of fact 78–80 in the liability phase, 192 Ct.Cl. at 160–161) that prior to the fall of 1965, plaintiff held itself out to the defendant as willing to accept Mode 5 shipments moving from the Canal Zone to points in the continental United States through the MSTS ports of New York, Norfolk, and New Orleans. From this premise, the commissioner reasoned that any of the three named ports would be a port that would normally service Mode 5 shipments from the Canal Zone destined for any point in the United States. Although there was an admitted diversion of shipment 11 to Hazard, Kentucky, that diversion was ordered while the shipment was at a port of debarkation (New Orleans) that would ordinarily be used to service Mode 5 shipments destined (from the Canal Zone) to points in Kentucky. Therefore, the diversion should be compensated, under Item 150B, like any other shipment (Mode 4 or Mode 5) diverted while still within the port that would be the "normal port" for a shipment from the point of origin to the diverted destination. Thus, in lieu of the applicable single-factor rate from point of origin to the initial GBL destination, shipment 11 would be compensated at the single-factor rate applicable from origin to points in Kentucky ($21.80 per hundredweight, or a total of $379.32), plus the standard diversion fee of $5, or a total of $384.32.

In the liability phase of this case, plaintiff argued with respect to shipments 8 and 13, both Mode 5 shipments originating in the Canal Zone destined for points in the United States, that it was entitled to *quantum meruit* recoveries for the additional land transportation it was required to perform as a result of defendant's failure to utilize the MSTS ports of debarkation nearest the destination points. (426 F.2d at 346–347, 192 Ct.Cl. at 109, 158–160.) On that issue we stated:

> As of the time when shipment 8 moved from the Canal Zone to Benton [Pennsylvania], the evidence in the record does not reveal any contractual provision or any understanding pursuant to which the defendant, in connection with a Mode 5 shipment, agreed to utilize as the port of debarkation the MSTS port nearest to the destination point.

The evidence in the record indicates that the plaintiff held itself out to the defendant as ready, willing, and able to accept Mode 5 shipments moving from the Canal Zone to points in the continental United States through the MSTS ports of New York, Norfolk, and New Orleans. As shipment 8 moved through the port of New York, the plaintiff did no more than what it had contracted to do when it transported the shipment from the port of debarkation to the destination point given in the bill of lading. Hence, there is no proper basis for an additional recovery on the theory of *quantum meruit*. (426 F.2d at 347, 192 Ct.Cl. at 109–110; footnote omitted.)

Shipments 8 and 13, like shipment 11, moved in Mode 5 prior to the fall of 1965. We concluded that as to shipment 8, plaintiff was not entitled to compensation over and above the applicable single-factor rate for shipments moving from the Canal Zone to points in Pennsylvania, despite the fact that the defendant chose the MSTS port of New York as the port of debarkation for shipment 8, rather than the MSTS port of Philadelphia, the latter port being closer than the port of New York to the destination, Benton, Pennsylvania. We concluded as to shipment 13 that plaintiff was similarly not entitled to compensation in excess of the single-factor rate in effect for shipments moving from the Canal Zone to points in California, despite the fact that the MSTS port of Oakland, California, is located closer to the destination for shipment 13 (Oakland, California) than the port actually utilized by defendant for shipment 13, the MSTS port of New Orleans. (Finding 80, 426 F.2d 329, 192 Ct.Cl. at 161.)

Further, in the *Global* case, *supra*, the carrier withdrew a claim for a *quantum meruit* recovery of additional compensation for a Mode 5 shipment originating in the Canal Zone and destined for Ft. Bragg, North Carolina. The withdrawal of the claim was based on our decision in the liability phase respecting shipments 8 and 13. It is significant that the shipment moved through the MSTS port of New Orleans rather than the MSTS port of Norfolk, the latter being the closest to Ft. Bragg of the three ports listed for Mode 5 shipments from the Canal Zone. (456 F.2d at 734–735, 197 Ct.Cl. at 607–608.)

Plaintiff argues that our decision in the liability phase respecting shipment 8 (and 13) does not control its claim at issue here, because shipment 11 involves a diversion under Item 150, while the claims on shipments 8 and 13 were for a *quantum meruit* recovery and did not involve a diversion. Plaintiff misunderstands our holding in the liability phase. What was there determined, as the trial commissioner correctly concluded, was that for shipments moving in Mode 5 from the Canal Zone to points in the continental United States, the parties specifically agreed that New York, Norfolk, and New Orleans would be utilized by the defendant as the ports of debarkation, and that the plaintiff would furnish the land transportation from the port of debarkation to the destination set forth on the GBL. The evidence shows that defendant was free to utilize any of the three ports for any given shipment moving in Mode 5 from the Canal Zone. Thus, for any such shipment, it was agreed that the three listed ports were to be the "normal ports" servicing the GBL destination points. Viewed in that light, it is irrelevant whether any Mode 5 shipment from the Canal Zone was diverted, while at the port of debarkation, from one domestic destination point to another. Shipment 11 was diverted from New Orleans to Hazard, Kentucky, but New Orleans was, for a Mode 5 shipment, a port that would normally service shipments moving from the Canal Zone to Hazard, Kentucky, as well as to New Orleans (or to Oakland, California, or to Ft. Bragg, North Carolina).

It follows that plaintiff's compensation under Item 150B for the diversion of shipment 11 is the applicable single-factor rate from the Canal Zone to points in Kentucky (a total of $379.32) plus the $5 diversion fee, a total of $384.32.

## VIII. *The Allegedly Improper Collection*

Special consideration is required in connection with contentions made by the defendant in the Rule 131(c) proceedings for the first time that certain amounts were improperly collected by the plaintiff on shipment 35.

Shipment 35 originated in Seaside, California, and was consigned to the property owner in care of the defendant's transportation officer in Bamberg, Germany. In accordance with the defendant's regulations during a maritime strike that was then in existence, shipment 35 was turned over in New Orleans to the Army Terminal, which arranged for the ocean portion of the transportation to be performed by the MSTS. The MSTS vessel discharged the shipment in Bremerhaven, Germany; and the defendant retained the shipment in Bremerhaven instead of surrendering it to the plaintiff for transportation to Bamberg, the GBL destination.

The plaintiff collected from the defendant the $5 flat diversion charge in connection with the alleged diversion of shipment 35 in Bremerhaven.

The requested findings and brief which the defendant submitted in the liability phase of the case did not seek to recoup the $5 referred to in the preceding paragraph. However, in the present proceedings under Rule 131(c), the defendant contends that since shipment 35 was never returned to the possession of the plaintiff after it was turned over to the MSTS in New Orleans, there could not have been any diversion of the shipment in Bremerhaven; and, accordingly, that the plaintiff erroneously collected the $5 flat diversion charge and the defendant is entitled to recoup this amount.

As indicated in part III of this opinion, it was incumbent upon the defendant to present in the liability phase of the case *all* the issues of law and fact relating to the right of the defendant to recoup from the plaintiff any amounts which the defendant regarded as having been improperly collected by the plaintiff. It is now too late, in the proceedings under Rule 131(c), to present for consideration an entirely new issue affecting liability that was not raised in the initial proceedings. For this reason, the defendant's attempt to present in the proceedings under Rule 131(c) the new issue as to whether there was a diversion of shipment 35 in Bremerhaven is untimely and should be disapproved for that reason.

## IX. *Attempted Reinstatement of Claim*

Shipment 38 (discussed in connection with another issue at part II of this opinion, *supra*) originated at Ft. Leavenworth, Kansas, and was consigned to the property owner at Ft. Kobbe, Canal Zone. The GBL authorized SIT for not to exceed 90 days at destination, and instructed the plaintiff to notify the transportation officer at Ft. Kobbe on arrival of the shipment. When such notice was given, the transportation officer ordered the shipment placed in SIT at a Government-owned storage facility in Curundu, Canal Zone, located 30 miles from Ft. Kobbe. Subsequently, after more than 180 days had elapsed, the shipment was delivered, at the defendant's request, from the Government-owned warehouse to the owner's residence at Ft. Kobbe.

In the liability phase of the case, the plaintiff asserted a claim in the amount of $272.25 for the delivery of shipment 38 from the Government-owned warehouse to the property owner's residence. In this connection, the plaintiff contend-

ed that the retention of shipment 38 in the SIT warehouse for a period longer than 180 days terminated the original contract between the plaintiff and the defendant, so that the subsequent transportation of the shipment from the SIT warehouse to the property owner's residence was under a new implied contract.

The court rejected the plaintiff's contention (426 F.2d at 351–52, 192 Ct.Cl. at 117–119), and dismissed the plaintiff's claim based on the delivery of shipment 38 from the Government-owned warehouse to the property owner's residence (426 F.2d 329, 192 Ct.Cl. at 174).

In the proceedings under Rule 131(c), the plaintiff again attempts to assert a claim for compensation in connection with the delivery of shipment 38 from the Government-owned warehouse to the property owner's residence. This time, the amount of the claim is $24.75 and it is said to be a charge under Item 145 of MBT No. 1 for delivery from SIT.

■ As the plaintiff's claim for the service of delivering shipment 38 from the Government-owned warehouse to the property owner's residence was dismissed in the liability phase of the case, the claim for this same service cannot properly be reviewed in the Rule 131(c) proceedings by advancing a new and different theory for the claim. Consequently, the plaintiff's present attempt to revive this claim, previously dismissed, must be rejected.

### X. *Conclusion*

As set out in the findings of fact, the plaintiff is entitled to recover a total of $2,544.51 on shipments 2, 3, 5–9, 12, 13, 17, 18, 21, 23, 24, 26, 28–31, and 34–38. Defendant is entitled to recover a total of $266.75 on shipments 11, 15, and 19. Therefore, a judgment will be entered in favor of the plaintiff in the amount of two thousand two hundred seventy-seven and 76/100 dollars ($2,277.76) the net amount due after deducting the sum due defendant.

The claims asserted by the plaintiff with respect to shipments 1, 4, 10, 14, 16, 20, 22, 25, 27, 32, and 33 are not meritorious, and the petition is dismissed as to them.

60 CCPA