**Daniel CHAPMAN and Jacque Stockman, Plaintiffs,**

**v.**

**Ben MEIER, Secretary of State for the State of North Dakota, Defendant.**

**Civ. No. 4664.**

United States District Court, D. North Dakota, Southeastern Division.

Jan. 30, 1974.

Probable Jurisdiction Noted April 29, 1974. See 94 S.Ct. 1988.

John D. Kelly, Wattam, Vogel, Vogel
& Peterson, Fargo, N.D., for plaintiffs.

Paul M. Sand, First Asst. Atty. Gen., Allen I. Olson, Atty. Gen., Bismarck, N. D., for defendant.

Before BRIGHT, Circuit Judge, BENSON, Chief District Judge, and VAN SICKLE, District Judge.

## MEMORANDUM OPINION AND ORDER

BENSON, Chief District Judge.

On May 18, 1972, this three judge district court panel heard evidence and oral argument on the constitutionality of the North Dakota legislative apportionment plan then in effect. On May 22, 1972, we entered an order requiring reapportionment of the state legislative districts to conform to the "one man, one vote" requirement of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

Thereafter, on June 30, 1972, this Court filed its Memorandum Opinion and Order, Judge Benson dissenting in part, adopting an interim apportionment plan effective only for the impending 1972 general election. The plan provided for thirty-nine senatorial districts, five of which were multi-member. It increased the size of the state senate by two and increased the state house of representatives by four. It decreased the number of legislative districts from thirty-nine to thirty-eight. The plan recognized that the interests of those persons residing on the air bases at Grand Forks and Minot were more closely aligned with urban than with rural interests, and included those populations within the nearby urban districts. The multi-member districts retained are located in the cities of Fargo, Grand Forks, Minot, Bismarck and Jamestown.

The Court retained jurisdiction over the cause, and directed its commission of three special masters to study and report upon a more permanent plan. Subsequently, on motion by Defendant Meier, the Court, on November 8, 1972, ordered that further action be deferred pending the possible adoption of a new apportionment plan by the 43rd Legislative Assembly of the State of North Dakota, in its 1973 session.

Over the veto of the Governor, the Legislature adopted an apportionment plan which continued the multi-member districts substantially as provided in the Court's plan, and as had existed in the state since 1965. The Governor's principal objection to the Legislature's plan centered on the multi-member senate districts.[1]

The operation of the plan adopted by the Legislature was suspended by referendum petition. By initiative petition, an amendment to the Constitution of North Dakota was proposed which would create a commission to reapportion the state and which would mandate the creation of single member senatorial districts. A statewide special election on the referred plan of the Legislature and the initiated constitutional amendment was held on December 4, 1973. Both measures were defeated. Therefore, the obligation to make a final determination on a reapportionment plan for the legislative districts of the State of North Dakota remains with this Court.

The plaintiffs urge the Court to proceed in accordance with its Memorandum Opinion and Order of June 29, 1972, wherein the majority suggested that if a new, more permanent, plan had to be fashioned by the Court, it would probably establish single member districts in light of Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971):

"When district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general rule." at 692, 91 S.Ct. at 1762.

On the other hand, the Defendant argues that this Court is not compelled by the *Connor* decision to create single member districts and urges us, in light of the apportionment decisions of the

---

1. Governor's veto message, Defendant's Report ot the Court, filed March 30, 1973.

United States Supreme Court that have been rendered since June 29, 1972, to adopt the June 29, 1972 Court plan (The Dobson Plan)[2] as the permanent plan for the State of North Dakota.

Evidence before this Court indicates that North Dakota is a sparsely settled, agricultural state with declining populations in most localities outside the urban areas. The state has fifty three counties. Most minor civil divisions in rural areas have very small populations that are becoming smaller. The 1970 Federal Census for North Dakota showed an overall state population of 617,761 persons, and a population density of 8.9 persons per square mile. The overall loss in population to North Dakota between 1960 and 1970 on a statewide basis was 2.3%. In 1960, the urban-rural population was divided 35.2% urban and 64.8% rural. In 1970, it was 55.7% urban and 44.3% rural. A total of 183 census county divisions are composed of mainly open country. Ten of these had more than 2,500 inhabitants in 1970, and thirty-nine (21.3%) had fewer than 1,000. The two smallest divisions had less than 500 inhabitants. The two largest census county divisions in this group had 1970 populations of 12,608 and 12,927, and contained the Grand Forks and Minot Air Force Bases.[3]

In hearings before the Joint Committee on Reapportionment held on January 3, 1973, State Representative Earl C. Rundle indicated that in Billings County there are 72 sections of land with no people residing on them. The total population of that county is 1,198. The population of the four largest cities in North Dakota in descending order are: Fargo, 53,365; Grand Forks, 39,008; Bismarck, 34,703; Minot, 32,290.[4]

Special Master Dobson, in presenting his plan, which with some minor amendments, was adopted by the Court on June 29, 1972, as an "interim" plan commented:

"The plan observes natural geographical barriers, such as the Missouri River . . . and . . . every district is connected with good arterial roads. It should not be necessary to travel outside of one's district in going from one part of it to another."

"In the formation of districts, parts of 10 counties are attached to an adjoining county or counties. However, in three instances (Burleigh, Ward and Williams), no real violence is done to county lines because an urban district is sealed off and the rural portion of the county is attached to a neighboring rural county. Three other counties which are divided (Barnes, Richland and Walsh) have traditionally been split into two districts. Thus, only four counties (McHenry, Cass, Morton and Stark) suffer any damage in the districting.

In this connection, it should be noted that the greatest complaints about the existing apportionment were voiced over the breaking of county lines, particularly in smaller rural counties. Counties with very small populations should not be split because they are thereby rendered politically powerless. It is a form of de facto disenfranchisement."

In its Order of June 29, 1972, this Court found that reapportionment was required because of the general population shift from rural to urban centers in North Dakota which "created constitutionally impermissible variations in population among the existing legislative districts of North Dakota".

The following is a chart of the plan adopted by this Court and is inserted in this Opinion to illustrate that it cures the "constitutionally impermissible vari-

2. Richard R. Dobson, one of the Special Masters appointed by the Court.

3. Stanley W. Voelker and Thomas K. Ostenson, Population Changes within Census County Divisions of North Dakota, 1950–1970, March, 1971.

4. 1970 Census of Population, U. S. Dept. of Commerce, Bureau of the Census, 1970.

ations", which were the basis for the court ordered reapportionment.

| | | | Percentage Variance From | Population Variance From |
|---|---|---|---|---|
| District Number | No. of Senators | Population Per Senator | Absolute Equality | Absolute Equality |

North Dakota Population—1970 Census 617,761
Number of Senators Provided for in Court Plan 51
Population per senator (absolute equality) 12,112

| District Number | No. of Senators | Population Per Senator | Percentage Variance From Absolute Equality | Population Variance From Absolute Equality |
|---|---|---|---|---|
| 1 | 1 | 12,250 | −1.13% | 138 |
| 2 | 1 | 11,615 | +4.10% | 497 |
| 3 | 1 | 12,481 | −3.04% | 369 |
| 4 | 1 | 13,176 | −8.71% | 1064 |
| 5 | 4 | 12,477 | −3.01% | 365 |
| 6 | 1 | 11,840 | +2.24% | 272 |
| 7 | 1 | 12,956 | −6.98% | 844 |
| 8 | 1 | 11,251 | +7.10% | 861 |
| 9 | 1 | 11,549 | +4.65% | 563 |
| 10 | 1 | 12,858 | −6.15% | 746 |
| 11 | 1 | 10,728 | +11.43% | 1384 |
| 12 | 1 | 12,349 | −1.96% | 237 |
| 14 | 1 | 12,679 | −4.68% | 567 |
| 15 | 1 | 12,915 | −6.62% | 803 |
| 16 | 1 | 11,296 | +6.73% | 816 |
| 17 | 1 | 10,731 | +11.42% | 1381 |
| 18 | 4 | 12,561 | −3.70% | 449 |
| 19 | 1 | 10,859 | +10.41% | 1253 |
| 20 | 1 | 11,534 | +4.78% | 578 |
| 21 | 5 | 12,048 | +0.05% | 64 |
| 22 | 1 | 11,448 | +5.48% | 664 |
| 23 | 1 | 11,007 | +9.12% | 1105 |
| 24 | 1 | 11,598 | +4.24% | 514 |
| 25 | 1 | 12,799 | −5.68% | 687 |
| 26 | 1 | 12,913 | −6.61% | 801 |
| 27 | 1 | 12,392 | −2.31% | 280 |
| 28 | 1 | 11,362 | +6.11% | 750 |
| 29 | 2 | 11,775 | +2.79% | 337 |
| 30 | 1 | 12,745 | −5.23% | 633 |
| 31 | 1 | 12,712 | −4.96% | 600 |
| 32 | 3 | 11,865 | +2.04% | 247 |
| 33 | 1 | 13,075 | −7.96% | 963 |
| 34 | 1 | 12,215 | −0.09% | 103 |
| 35 | 1 | 12,158 | −0.04% | 46 |
| 36 | 1 | 11,021 | +9.92% | 1091 |
| 37 | 1 | 12,405 | −2.42% | 293 |
| 38 | 1 | 12,566 | −3.75% | 454 |
| 39 | 1 | 12,743 | −5.21% | 631 |

The majority of this Court has concluded that the interim plan should be adopted as the permanent plan. Judge Bright, in dissenting, is concerned with the fact that Districts 5, 18, 21, 29 and 32 are multi-member districts, and with the fact that the 11.43% overrepresentation in District 11, coupled with the 8.71% underrepresentation in District 4, creates what he feels to be an impermissible variation of 20.14%.

## I. MULTI–MEMBER DISTRICTS

There has been no showing before this Court that multi-member districts, which have existed in North Dakota since 1965, have resulted in discrimination of any kind against any groups. Plaintiff's counsel, in his brief filed with the Court on May 5, 1972, said: "Plaintiffs do not assume the burden of establishing that multi-member senate and house districts are violative of the United States Constitution". Relying on *Connor*, the thrust of the contention appears to be that multi-member districts cannot be allowed to continue because they were initially fashioned by the Court.

The situation in Mississippi, faced by the court in *Connor*, is obviously quite different from that which exists in North Dakota. According to the 1970 census, the State of Mississippi has a population of 2,216,912, and a population density of 49.6 persons per square mile. The white population is 1,393,293; the black population is 815,770.[5] In North Dakota, except for the Indian Reservations, none of which are included in the multi-member senate districts, there are no identifiable minorities.

Four days after its decision in *Connor*, the Supreme Court handed down Whitcomb v. Chavis, 403 U.S. 124, 91 S. Ct. 1858, 29 L.Ed.2d 363 (1971), wherein it reviewed the decision of a three judge court convened to consider whether two Indiana statutes had the effect of diluting the vote of Negroes and poor people living in Marion County (City of Indianapolis). The district court panel concluded that the existing multi-member district must be separated because of strong differences in minority groups, housing, income and educational levels. With respect to Marion County, the three judge panel drafted and adopted a plan said to protect the "legally cognizable racial minority group against dilution of its voting strength", 307 F. Supp. 1362, at 1365 (S.D.Ind.1969). On appeal, the Supreme Court, in passing

5. 1973 World Almanac, Newspaper Enterprise Association.

on the redistricting of Marion County into single member districts, reversed, saying that while Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), recognizes the right of every citizen to full and effective participation in the political processes of his state's legislative bodies, that decision did not render multi-member districts impermissible.

"In our view, however, experience and insight have not yet demonstrated that multi-member districts are inherently invidious and violative of the Fourteenth Amendment. Surely the findings of the District Court do not demonstrate it. Moreover, if the problems of multi-member districts are unbearable or even unconstitutional it is not at all clear that the remedy is a single-member district system with its lines carefully drawn to ensure representation to sizable racial, ethnic, economic, or religious groups and with its own capacity for overrepresenting parties and interests and even for permitting a minority of the voters to control the legislature and government of a State. The short of it is that we are unprepared to hold that district-based elections decided by plurality vote are unconstitutional in either single- or multi-member districts simply because the supporters of losing candidates have no legislative seats assigned to them. As presently advised we hold that the District Court misconceived the Equal Protection Clause in applying it to invalidate the Marion County multi-member district." 403 U.S. at 159–160, 91 S.Ct. at 1877–1888.

Citing particular problems which might render a multi-member plan ineffective, *Whitcomb* announced that the circumstances of each case must be considered.

In Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), the Supreme Court specifically held that multi-member districts were not per se illegal under the Equal Protection Clause.

In the 1973 case of Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the court noted that considerations of substantial malapportionment with respect to military personnel and combinations of other unique factors must be considered in preferring single-member over multi-member districts or vice versa.

In the case of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court was called upon to consider a Texas reapportionment plan. Again the Court stated that multi-member districts are not unconstitutional per se, (citing *Whitcomb, Mahan* and *Sims*) but where the claim is that such districts are being used *invidiously* to cancel out or minimize the voting strength of racial groups, they must be questioned.

The Texas multi-member districts, it was found, did operate to exclude the black community from the electoral process. This case points up one of the basic foundations common to all cases finding multi-member districts unconstitutional; that is, invidious discrimination against some visible minority group. *See also* Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), involving Mexican-Americans.

The group must be identifiable and must be effectively removed from the electoral process by reason of the districting scheme. As the Court in *White* notes, not every racial or political group has a constitutional right to be represented in the state legislature, 412 U.S. at 769, 93 S.Ct. at 2341, 37 L.Ed.2d at 326. Earlier in *Whitcomb,* the court commented that were every group entitled to representation, the result would be inane for within every district there are workers, university communities, religious and ethnic groups occupying identifiable areas.

A court, in considering various reapportionment options before it, should go only as far as is necessary in order to meet the constitutional requirements of "one man, one-vote". Minneso-

ta State Senate v. Beens, 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972).

The tenor of the Supreme Court decisions with respect to reapportionment, clearly does not compel institution of single-member districts in North Dakota. The circumstances existing in this state contrast with those existing in states where apportionment plans were found constitutionally deficient. The complexion of the state and of individual cities within the state does not present any showing of unrepresented minorities or unresponsive representatives.

The issue of multi-member districts or single-member districts is clearly a political issue to be resolved by the electorate and the legislature. In devising a plan, this Court will go no further than is required to formulate a constitutionally sufficient apportionment plan for the State of North Dakota, and will not intrude on the political realm.

## II. VARIANCE

While we are satisfied that the Court plan adopted June 29, 1972, is not constitutionally deficient by reason of the multi-member districts, consideration must be given to the realm of permissible variance. This Court, by its order filed May 22, 1972, appointed three special masters to serve as a commission to formulate an apportionment plan. The following guidelines to the commission were offered by the Court:

"a. The Commission shall try to conform new legislative districts to the existing districts.

b. The Commission shall not substantially change the size of the Legislature.

c. Natural geographic barriers shall be observed.

d. Existing political subdivision lines should be observed, in so far as possible.

e. In the event the Commission should find that it is unnecessary to substantially alter any one or more of the legislative districts

presently defined, then it must consider and make recommendations relative to whether or not the incumbent senator or senators, whose term does not expire at the end of this year, must nevertheless stand for election in 1972."

One of the unique features existing in North Dakota is the Missouri River, which separates the state into two parts —two-thirds to the east and one-third to the west. The river traversing the state is crossed by only six highway bridges, four of them located in the area of Williston and Bismarck. This geographical reality, coupled with the difficulty of achieving the goals of observing geographical boundaries and existing political subdivisions, adds to the difficulty of minimizing the variance. That it was substantially accomplished, as illustrated by the chart made a part of this opinion, attests to the validity and soundness of the plan. The population variance between the districts in most cases is only a few hundred people. As a general rule, deviations from the average population decreases if many county lines are violated, and increases if few are split. The effort to preserve urban-rural identities and county lines intact produce the variations which look large percentage wise, but when applied to a sparsely populated state do not result in significant population variances.

In *Mahan,* the court considered the validity of a Virginia apportionment plan allowing for a 16% deviation. The Court stated that neither courts nor legislatures, can extract with accuracy from the Fourteenth Amendment, the mathematical formula that establishes what range of percentage deviation is permissible and what is not. While the 16% deviation of the Virginia plan may have approached the limits, it did not exceed them, said the Court.

The key, it seems, as to whether a certain deviation will be allowable is whether or not the deviation causes a sacrifice of substantial equality. A per-

centage of variance can only have validity when measured against the actual number of electors, communities of interest, transportation, and size of the base from which the representation is drawn.

Virginia is a heavily populated state, and a 16% deviation there results in population discrepancies of thousands. That same percentage applied to a sparsely populated state like North Dakota, would result in actual deviations of only a few hundred persons.

The issue presented to the court in *Mahan* was whether or not the equal protection clause permits only limited population variances which are unavoidable, despite a good faith effort to achieve absolute equality. The court said that some variation from the one man, one vote rule is unavoidable, because blind application of "absolute equality" in state redistricting might well impair the normal functioning of state and local governments.

In Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967), the Supreme Court disapproved a Florida reapportionment plan having a 26% deviation. The Court, noting that no evidence in support of the deviation had been offered, said the allowable variation for one state has little bearing on the validity of a similar variation in another state.

In 1972, a three judge district court in Graves v. Barnes, 343 F.Supp. 704 (W.D.Tex.1972), declared unconstitutional a Texas reapportionment plan having a total variation between the largest and smallest district of 9.9%. On appeal, the Supreme Court in White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), said that a 9.9% deviation does not establish a prima facie equal protection violation. Citing *Mahan*, the Court said that relatively *minor population* deviations among state legislative districts do not substantially dilute the weight of individual votes in the larger districts.

Similarly, Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), decided at the same time as *White*, held that a state's redistricting plan is not to be judged by the more stringent standards applicable to Congressional reapportionment. In *Gaffney*, the Court said that while fair and equal representation is the goal, its attainment does not depend on elimination of insignificant population variations.

"Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that states may be legitimately mindful of. An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in a day-to-day operation are important to an acceptable representation and apportionment arrangement."

"That the Court was not deterred by the hazards of the political thicket when it undertook to adjudicate the reapportionment cases does not mean that it should become bogged down in a vast, intractable apportionment slough, particularly when there is little, if anything, to be accomplished by doing so.

"This very case represents what should not happen in the federal courts. The official state functionaries proposed a plan with a maximum variation among the districts of 7.89% in the House and 1.8% in the Senate, and with respective average variations of 1.9% and .45%. Appellees then proposed four alternative plans for the House, three of which involved slightly larger variations among districts but cut fewer town lines. The fourth cut more lines, but had a maximum variation between its largest and smallest district of only

2.6%. The District Court thought the state plan involved acceptably large variations between districts, although in the House, with districts of about 20,000 people, the average variation involved only 399 people, and the largest variations involved only 1,573 people. But neither did the District Court adopt any of the plans submitted by appellees. Instead, it appointed its own master to come up with still another scheme. That plan, we are told, involves a total maximum deviation in the House of only 1.16%. Was the master compelled, as a federal constitutional matter, to come up with a plan with smaller variations than were contained in appellees' plans? And what is to happen to the master's plan if a resourceful mind hits upon a plan better than the master's by a fraction of a percentage point? Involvements like this must end at some point, but that point constantly recedes if those who litigate need only produce a plan that is marginally 'better' when measured against a rigid and unyielding population equality standard." 412 U.S. at 748–751, 93 S.Ct. at 2329–2330, 37 L.Ed.2d at 309–311. (citations omitted).

■ Once a plan has been formulated which, in consideration of all the attendant circumstances, fairly meets the constitutional requirements, a court should not continue to sift and shuffle abstract figures solely to arrive at a mathematically perfect plan.

Where there are identifiable minorities or political groups being forced out of the election process *and* their voting strength is *invidiously* weakened, a plan proper in other respects may require a further examination. As we view the cases, deviations of 16%, 8%, and 10% have recently been allowed in heavily populated states having significant minority populations.

■ Even greater deviations are permissible in a sparsely settled state barren of electorally victimized minorities.

We adopt the Court Plan of reapportionment previously adopted as an interim plan on June 29, 1972, as set forth in Appendix A of that Order, (published at 372 F.Supp. 363) as the permanent plan for reapportionment for the State of North Dakota.

It is ordered that judgment be entered accordingly.

BRIGHT, Circuit Judge (dissenting).

I respectfully dissent.

Today, a reconstituted majority of this court permanently adopts the stop-gap apportionment scheme for North Dakota's State Legislative Assembly known as the Dobson Plan, in the face of our earlier order [1] which stated:

We approve the Dobson Plan of reapportionment at this time for the 1972 election only. This court retains jurisdiction of this cause for the purpose of adopting a different plan of reapportionment which will not be hampered by considerations of impending elections. [Chapman v. Meier, 372 F.Supp. 363, 367 (D.N.D., filed June 30, 1972)].

My colleagues thus have wordlessly brushed past the doctrine of the "law of the case," [2] changed completely the course of our previous decisions, and,

1. Chapman v. Meier, Civil No. 4664, 372 F. Supp. 363 (D.N.D., filed June 30, 1972).

2. Although this doctrine "merely expresses the practice of courts * * * not a limit to their power," Messenger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.), the Eighth Circuit has recognized it to be "a salutary rule of practice" and stated that a former decision of the same case would not be reversed unless the court were convinced that the former decision was "clearly erroneous and that it works a manifest injustice." Kempe v. United States, 160 F.2d 406, 408 (8th Cir.), cert. denied, 331 U.S. 843, 67 S.Ct. 1534, 91 L.Ed. 1864 (1947); Emery v. Northern Pacific Railroad Company, 407 F. 2d 109, 112 (8th Cir. 1969).

A similar version of the doctrine applies in the Court of Claims, which stated:

Where substantially similar questions have been determined in prior litigation, including a prior proceeding in the same case,

without further hearing of any kind, placed into effect a legally flawed plan whose overriding virtue at the time of its "temporary" adoption in 1972 was that it would cause minimum disruption in the then-pending elections and yet reduce substantially the existing inequality between legislative districts under the "one-man, one-vote" standard.

In our order filed June 30, 1972, we stated:

> We recognize certain weaknesses in the Dobson Plan, namely, (1) some variance in population among the legislative districts, which, in a few instances, seems substantial; (2) an increase in the size of the legislature, notwithstanding that the state has lost population over the past decade; and (3) a continuation of multi-member legislative districts. [Chapman v. Meier, *supra* 372 F.Supp. at 363.]

Simply stated, in adopting this plan today, the majority has not followed the supervisory admonition of the Supreme Court, contained in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), and reaffirmed in Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed. 2d 320 (1973), disapproving the use of multi-member districts in court-fashioned plans. Nor has the majority adhered to the equal protection standard for permissible population variances between districts, enunciated in *Mahan,*

*supra*; Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), and White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

My colleagues argue that we must not "intrude on the political realm" by eliminating multi-member districts, nor should we "sift and shuffle abstract figures" to achieve smaller deviations between districts. These arguments, I fear, miss the point. The former ignores the political consequences of simply preserving the status quo, while the latter substitutes convenience for the Constitution.

I agree with my colleagues that we must decide this case outside the "political realm," but the assumption of the majority that doing nothing with the existing plan is not doing something represents a "head-in-the-sand" viewpoint. Either doing something or doing nothing may have political consequences, but we, of course, must close our eyes to those consequences. Our decision must be based upon application of proper legal and constitutional principles.

The path to a proper resolution of the substantive issues in this case lies in understanding the nature of the decision that we are called upon to make. Unlike so many courts, we are not confronted with a challenge to an apportionment scheme duly enacted by a state legisla-

---

the court will not consider such arguments unless there are compelling circumstances that require review of prior holdings. Considerations of judicial economy and orderly disposition of the issues render it desirable that both parties proceed directly to the issues yet undecided and forgo a purposeless and time-consuming rehashing of cold matters.
Trans Ocean Van Service v. United States, 470 F.2d 604, 620 n. 3, 200 Ct.Cl. 122 (1973).
District courts too are subject to the rule, and it has been said:
Under the doctrine known as the law of the case, the unreversed decision of a question of law or fact made during the course of litigation settles that question for all subsequent stages of the suit. Orderly and consistent progress of the case

requires that the parties be precluded, with rare exceptions, from re-opening and re-arguing matters already decided. [United States v. Swift & Company, 189 F. Supp. 885, 902 (N.D.Ill.1960) (citations omitted), aff'd, 367 U.S. 909, 81 S.Ct. 1918, 6 L.Ed.2d 1249 (1961).] *Accord* Barrett v. Baylor, 457 F.2d 119, 123 (7th Cir. 1972).
The question of the inappropriateness of the Dobson Plan as a permanent solution to North Dakota's reapportionment woes has already been settled by our order of June 30, 1972. To reverse our publicly stated view of this matter—without some new circumstance compelling that change—thus violates the sound judicial principles underlying the doctrine of the "law of the case" and seriously undercuts the stability of our decision-making process.

ture, where the threshold question is whether a constitutional violation exists to justify federal court intervention. We are well past that point in this litigation. The invalidity of the existing apportionment scheme was adjudicated in our order of May 22, 1972. What remained, following our temporary adoption of the Dobson Plan on June 30, 1972, was a final exercise of our equity power to fashion a more permanent remedy in the form of a new apportionment plan.

The general question now before us is this: what are the obligations and restrictions on the discretion of a federal district court in the exercise of this equity power? In particular, we search for an answer to these two specific questions:

1) Must the court replace multi-member districts with single-member districts where the former were never established as a matter of state policy, but were originally adopted as an expedient in a previous court-fashioned plan?

2) How close to absolute equality must the court come in re-drawing district lines in the absence of clearly controlling state apportionment policy?

Before suggesting my answers to these two points, I think that a detailed review of the history of reapportionment in North Dakota is useful.

## I.

History shows that the North Dakota Legislature reapportioned itself infrequently and not too well. Mr. Richard Dobson, political editor of the Minor Daily News and drafter of the Dobson Plan here in question, has described the situation in these words:

In eight decades of statehood, the reapportionment problem has never been dealt with satisfactorily. Much of the time the legislature simply tried to ignore the problem. When action was taken, it was usually designed to preserve the *status quo* and safeguard incumbent legislators. [Dobson, Reapportionment Problems, 48 N.D.L.Rev. 281 (1972).]

Importantly, there has been no valid, new apportionment scheme placed into effect by the legislature since 1931. Variances between districts, which existed even then, swelled with population shifts over the intervening years. For example, Renville County had 7,263 inhabitants in 1930, while the City of Fargo had 28,619; 30 years later, the 43rd District (Renville County) had shrunk to 4,698 while the 9th District (Fargo) had expanded to 46,857. *See* Dobson, *supra* at 285.

In 1961, a state reapportionment commission—created by a 1960 amendment to the North Dakota Constitution—sought to re-draw the districts, but produced a plan clearly favoring the rural areas in representation.[3] An initial court-challenge was rejected by the state supreme court on a minor procedural point. State ex rel. Aamoth v. Sathre, 110 N.W.2d 228 (N.D.1961). The plaintiffs then turned to the federal district court which abstained, pending further action by the state supreme court. Lein v. Sathre, 201 F.Supp. 535 (D.N.D.1962) (Davies, J., dissenting). Accepting jurisdiction, the state supreme court invalidated the commission plan based on state consitutional law principles. State ex rel. Lein v. Sathre, 113 N.W.2d 679 (N.D.1962).

Following the United States Supreme Court's historic decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962), the plaintiffs returned to federal district court, but were again rebuffed. The court denied injunctive relief on the ground that there was no showing that the state legislature would not heed the state constitution's mandate to redistrict. Lein v. Sathre, 205 F.Supp. 535 (D.N.D.1962) (Davies, J., dissenting).

3. *See* Dobson, Reapportionment Problems, 48 N.D.L.Rev. 281 285 (1972).

Rural interests in the legislature, however, pushed through a reapportionment scheme in the 1963 Session which comported with no known version of the "one-man, one-vote" principle. *See Dobson, supra* at 286. Based upon the then-newly-decided case of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L. Ed.2d 506 (1964), the federal district court invalidated that scheme as well as those portions of the state constitutional provisions relating to apportionment (sections 26, 29, and 35) amended in 1960. The court, however, refused to take further action until the legislature was given an adequate opportunity to reapportion itself within the Reynolds v. Sims guidelines. Paulson v. Meier, 232 F.Supp. 183 (D.N.D.1964) (Davies, J., dissenting in part) [*hereinafter Paulson I*].

A compromise legislative plan, enacted on the final day of the 1965 Session, became law without the signature of the governor, but made little improvement over the invalidated 1963 version. This plan was promptly nullified by the federal district court which then ordered into effect its own plan. Paulson v. Meier, 246 F.Supp. 36 (D.N.D.1965) [*hereinafter Paulson II*]. In a radical departure from state precedent, the court included in its plan five predominantly urban, multi-member senate districts, thereby creating the problem which is at the heart of the present dispute. This court-fashioned plan remained in effect until voided by our order of May 22, 1972, in the instant action.

Early in 1971, following some inconclusive grappling with the politically hot issue of multi-member districts by the legislature,[4] a suit was brought in state court challenging the districts on state constitutional grounds. The North Dakota Supreme Court ruled that that portion of section 29, which since statehood had required single-member senate districts, had been necessarily invalidated along with the other constitutional provisions relating to reapportionment in *Paulson I*, and dismissed the suit. State ex rel. Stockman v. Anderson, 184 N.W. 2d 53 (N.D.1971).

This action was commenced in November 1971. Plaintiff alleged that population changes reflected in the 1970 Census had altered the urban-rural balance and that the court-fashioned plan of 1965 no longer provided representation in the legislature complying with the Equal Protection Clause of the fourteenth amendment. They further alleged that, since the legislature had failed to reapportion itself in 1971, the court was required to do so.

A three-judge district court was not requested by plaintiffs until they filed an amended complaint on May 8, 1972.[5] This panel, therefore, faced a

---

4. Republication legislators from the five urban districts, which elected from two-to-four senators each, wanted to retain the feature of at-large elections in these districts; but the Democrats wanted to subdivide those districts. Some rural Republication lawmakers also opposed multi-senator districting, contending that it gave urban residents an undue advantage. [*Id.* at 287.]

5. Although the record in this court does not indicate any reasons for delay in processing the action, we take judicial notice that North Dakota was undertaking the drafting of a new constitution and that a Constitutional Convention consisting of delegates representing the people of North Dakota were considering proposals to provide for reapportionment by a commission. *See* Peti-

tioner's Application for Stay to the United States Supreme Court at 3–4 (dated July 11, 1972), Chapman v. Meier, Civ. No. 4664, 372 F.Supp. 363 (D.N.D.).

The Constitutional Convention adopted the following proposal as a reapportionment method for a *bicameral* legislature:

Section 5, REAPPORTIONMENT.

A legislature reapportionment commission, consisting of electors appointed by the district judges in a number and manner as shall be established by the district judges, shall fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators. The commission shall guarantee, as nearly as practicable, that every voter is equal to every other voter in the state in the casting of ballots for legisla-

time pressure in hearing the case and awarding relief, if appropriate, before the then-impending 1972 primary and general elections. We were acutely aware that making substantial changes in legislative district boundaries might lead to great confusion and disruption in the conduct of the elections and the op-

> tive candidates. One senator and at least two representatives shall be apportioned to each senatorial district and be elected at large or from subdistricts thereof. The commission may combine two senatorial districts and provide for the election of senators at large and representatives at large or from subdistricts thereof.
>
> The commission shall prescribe its own procedures. Upon agreement by a majority of its members, the commission shall file its reapportionment plan with the secretary of state, and it shall become effective sixty days after the date of filing; provided, the supreme court, in the exercise of original jurisdiction, may review any plan adopted by the commission. If the plan fails to meet state or federal constitutional requirements, the court shall direct the commission to revise the plan within a stated time.
>
> Commission members shall be appointed following adoption of this constitution and immediately following the 1980 · general election and every ten years thereafter. No member of the legislative assembly shall be eligible, during his term of office, for appointment to the commission. Commission members shall serve until each reapportionment plan becomes finally effective, and shall be compensated as provided by law. Vacancies shall be filled in the same manner as for original appointment. [Article IV, § 5 (Alternate Proposition 1A), Final Draft of the Constitutional Convention as presented February 17, 1972, to the Plenary Session, Daily Journal of the Constitutional Convention, at 540.]

As an alternative if the people adopted a *unicameral* form of legislature, the proposed reapportionment section stated:

> Section 5. REAPPORTIONMENT.
>
> A legislative reapportionment commission, consisting of electors appointed by the district judges in a number and manner as shall be established by the district judges, shall fix the number of legislators and divide the state into legislative districts of compact and contiguous territory. No district shall elect more than four legislators, and the commission shall guarantee, as nearly as practicable, that every voter is equal to every other voter in the state in the casting of ballots for legislative candidates.

erations of the political parties in North Dakota, which are required to organize and operate on the basis of legislative districts. N.D.Cent.Code § 16–17–01 et seq. (Supp.1971).[6]

This court, nevertheless, determined that our obligations as judges required us to undertake immediate consideration

> The commission shall prescribe its own procedures. Upon agreement by a majority of its members, the commission shall file its reapportionment plan with the secretary of state, and it shall become effective sixty days after the date of filing; provided, the supreme court, in the exercise of original jurisdiction, may review any plan adopted by the commission. If the plan fails to meet state or federal constitutional requirements, the court shall direct the commission to revise the plan within a stated time.
>
> Commission members shall be appointed following adoption of this constitution and immediately following the 1980 general election and every ten years thereafter. No member of the legislative assembly shall be eligible, during his term of office, for appointment to the commission. Commission members shall serve until each reapportionment plan becomes finally effective, and shall be compensated as provided by law. Vacancies shall be filled in the same manner as for original appointment. [Article IV, § 5 (Alternate Proposition 1B), *id.* at 543.]

The voters of North Dakota on April 28, 1972, rejected the constitution and the North Dakota reapportionment again fell into the laps of federal judges.

6. The Chairman of the North Dakota Republican State Committee, for example, stated that his party had already commenced processes leading to the selection of delegates to state and national party conventions and that local party districts were in the process of endorsing legislative candidates. He concluded that:

> If the court indicates a new apportionment will be undertaken before the 1972 elections the entire political structure will be suspended in confusion until the new district lines are determined. When the determination is made the entire process will have to be begun again and there will not be time to accomplish the necessary procedures required by the parties in an election year.

Affidavit of Jack Huss in Support of Defendant's Answer to Amended Complaint (filed May 18, 1972), Chapman v. Meier, Civil No. 4664 (D.N.D.).

of positive action. After hearing the case on May 18, 1972, we acted on the merits four days later, declaring:

> The plaintiffs have made a legally sufficient showing that the existing legislative apportionment scheme in the State of North Dakota fails to meet Federal Constitutional standards. [Chapman v. Meier, Civ. No. 4664 (D.N.D., filed May 22, 1972) at 1.]

We further said that we would attempt promptly to reapportion the state in conformity with federal constitutional standards and in time for the 1972 elections. To aid us in this task, we appointed three Special Masters.[7] Exhibiting our real concern for avoiding disruption to the political processes on the eve of the 1972 elections, we set out specific guidelines for the Masters.[8] On June 20–21, 1972, we met with the Masters to consider eight alternate plans of reapportionment.

In our memorandum opinion and order filed June 30, 1972, we settled on a slightly amended version of a plan drafted by Master Dobson, now called the Dobson Plan, as an appropriate means of affording interim relief to the citizens of North Dakota from malapportionment.[9] This relief was tailored to the exigencies of the pre-election situation and geared to minimizing disruption in the political and electoral processes.[10]

In their amended complaint, plaintiffs had asked that we provide for single-member districts in any reapportionment plan adopted by the court. In our opinion we recognized the validity of plaintiffs' request, but did not grant relief at that time in order to avoid "extreme disruption in the elective processes."[11] However, we directed the Masters to give additional study to

7. Mr. Richard Dobson of Minot; Mr. Thomas K. Ostenson of Fargo; and Mr. R. R. Smith of Grand Forks. We regret to note that Mr. Smith has since passed away, after serving our court well on this and other occasions.

8. *See* opinion of Judge Benson, *supra* at 367.

9. Judge Benson, concurring in but not signing the order, stated in a separate opinion that he would not limit the plan to the 1972 election.

10. Among other things, we said:
The plan substantially reduces the disproportionate representation which would result from elections under the existing apportionment of North Dakota. At the same time, the Dobson Plan causes a minimum disruption in the election processes for the 1972 primary and general elections. * * * To avoid major change in the present legislative district boundaries, the Dobson Plan provides for an increase in the size of the legislature. In this way, the number of inhabitants attributable to each senator for equal representation is reduced to a figure compatible with the present populations of the rural districts, thereby avoiding the substantial remapping of these districts which would have been necessary if the number of senators had been kept at 49. [Chapman v. Meier, Civil No. 4664, 372 F.Supp. 365, 366 (D.N.D., filed June 30, 1972).]
In the odd-numbered districts which had elected senators for a four-year term in

1970, we took the following steps to minimize disruption. Since we made substantial changes in only four legislative districts having such "holdover" senators, we required new elections in those districts, but otherwise permitted all other "holdover" senators to serve out their terms. We permitted certain metropolitan districts to conduct elections only to fill vacancies attributable to any additional seats given them in the new plan.
As to even-numbered districts, we noted:
No serious problems for the 1972 elections seem likely to arise from proposed changes in the boundaries of several *even-numbered* districts under the Dobson Plan since the terms of senators last elected from all even-numbered districts will expire this year. In each even-numbered district, as changed by the Dobson Plan, the electors in 1972 will select a senator or senators as well as house members to represent them during the next legislative session. [*Id.*, at 366.]

11. We said in this regard:
We briefly comment on the continuation of the five multi-member senatorial districts in which are located the cities of Fargo, Grand Forks, Minot, Bismarck, and Jamestown. In the most populous 21st district, encompassing the Fargo area, voters may be called upon to elect fifteen members of the legislative assembly to represent that district, five to serve in the Senate and ten to serve in the House of Representatives. In each of the other

reapportionment [12] and to submit an additional report. We recognized the public's interest in the court's proceedings by making arrangements for "interested persons" other than the named parties to express their views.

Our order filed June 30, 1972, should have been the prelude to a final determination of the reapportionment controversy for the decade of the 1970's. But this panel, much like the earlier panel in *Paulson I,* paid great heed to the request of the State of North Dakota to stay our hand to give the legislature another opportunity to "carry out its duties, responsibilities, and functions" to reapportion itself. *See* Brief in Support of Defendant's Motion for Stay (filed October 30–1972) at 4, Chapman v. Meier, Civil No. 4664 (D.N.D.). Attached to this motion was a copy of a letter from Representative Bryce Streibel, Chairman of the North Dakota Legislative Council,[13] creating a bipartisan Special Committee on Reapportionment, consisting of six legislators and five citizens, to study and to develop a reapportionment plan for submission to the legislature and "for use by [state and federal] courts in any judicial proceedings relating to reapportionment of the North Dakota legislature." *See* At-

multi-member districts, the electors may also be called upon to elect a substantial number of representatives at a single election. If each of the major political parties endorses a full slate of candidates, the electorate in the largest multi-member district could be called upon to judge the qualifications of at least thirty candidates for state legislative office. In such circumstances, the task confronting a voter in making a considered choice among individual candidates would appear to be most formidable.

The five multi-member legislative districts were created by the Federal District Court in Paulson v. Meier, 246 F.Supp. 36 (D.N.D.1965), and not by enactment of the Legislative Assembly. In light of subsequent Supreme Court pronouncements, we believe it would be improper for this Court to permit their continuation in a court-fashioned plan. In Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed. 2d 268 (1971), the Court stated:

* * * (W)hen district courts are asked to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter. *Id.* at 692, 91 S.Ct. at 1762.

The Supreme Court subsequently re-emphasized this ruling in Connor v. Williams, 404 U.S. 549, 551, 92 S.Ct. 656, 30 L.Ed. 2d 704 (1972). We feel constrained to permit multi-member districts to continue during the 1972 elections, however, to avoid extreme disruptions in the elective processes. We recognize that political party organizational structure has been formed, for elections subsequent to the 1965 apportionment decision, along legislative district lines. *See generally* Ch. 16–17 NDCC. We recognize that it takes considerable time for members of a political party to organize and operate effec-

tively for the benefit of the electorate, following a change in district boundaries. We think it inappropriate, therefore, to change the method of selecting the members of the legislative assembly in these multi-member districts at this late date in light of the confusion which such a change would likely precipitate. We feel that the electorate will be better served by minimizing the confusion surrounding the impending elections, that it would be by the abolition of multi-member districts at this eleventh hour. , [*Id.,* at 366.]

12. We specifically requested · the following: The Special Masters should give additional consideration to creating legislative districts along the lines suggested in the Ostenson Plan, the boundaries of which should remain as compact as possible while taking into account ease of travel within each district, as well as the substantial identity of economic and social interests among its inhabitants. The guiding principle of this study, of course, will be the requirements of equal representation mandated by the Fourteenth Amendment to the United States Constitution.

Additionally, the Masters are directed to modify the Ostenson Plan so as to eliminate the existing multi-member senate districts by creating senate districts or subdistricts each of which shall be represented by a single senator and two house members in the North Dakota Legislative Assembly. [*Id.* at 368.]

13. The Legislative Council is a special body of the state legislature created to study matters of public interest and to recommend appropriate action by the legislature. The Council itself is composed entirely of legislators, but Council committees may include private citizens. N.D.Cent.Code § 54–35–01 et seq. (Supp.1973).

tachment to the Brief in Support of Defendant's Motion for Stay (filed October 30, 1972), Chapman v. Meier, Civil No. 4664 (D.N.D.).

Subsequently, we granted a stay of the proceedings, observing that "no prejudice is likely to follow from this court's deferring further action on reapportionment until the 1973 legislature has had the opportunity to consider the reapportionment question." Chapman v. Meier, Civil No. 4664 (D.N.D., filed November 8, 1972) at 3. We further directed the Attorney General to file a report to this court regarding action taken by the legislature, and, retaining jurisdiction, we stated that our order was "without prejudice to the contentions made by the plaintiffs in these proceedings." Id. at 3–4.

The report, filed by the Attorney General on March 30, 1973, discloses that, with great diligence, efficiency, and promptness, the Committee formulated a reapportionment plan which on its face at least complied with constitutional standards and appeared to be free of partisanship. Legislative Council Chairman Streibel described the plan, introduced as House Bill 1042, in these words:

House Bill No. 1042 leaves 32 county lines intact. It has the smallest deviation ratio of all the plans submitted to either the Court or the Committee. The deviation ratio is 1.04–1, which is determined by taking the high percentage of the mean population (District #18–12,599 per Senator — + 2%) and dividing it by the low (District #22–12,150 per Senator percentage of the mean population — − 1.6%). House Bill No. 1042 calls for 50 Senators and 100 Representatives in 37 legislative districts.

House Bill No. 1042 rigidly adheres to the one-man, one-vote requirement established by the Court. It maintains the "Communities of interest" philosophy to a great degree.

Reapportionment is a legislative responsibility and not a job for the Courts. As elected representatives of the people, legislators can express the wishes of the voters regarding reapportionment better than appointed judges.

House Bill No. 1042 was adopted unanimously by the Council's Reapportionment Committee. The plan meets all the Courts' tests for acceptability. It breaks fewer county lines than many plans submitted. It keeps legislative representation pretty much as it is. It does not drastically reduce the number of legislators which would have had the effect of reducing rural representation. The rural voice of North Dakota is fading fast enough as it is without us hastening it.

The plan leaves in the current multi-senator districts. Subdistricting can be done at a later date if the legislature so desires. There just isn't enough census data from Grand Forks, Minot, or Bismarck to reapportion at this time on any basis other than multi-senator districts.[14]

14. Statement by Rep. Bryce Streibel to Joint Senate and House Reapportionment Committee, January 3, 1973, Exhibit 3, Return to and Compliance with Order (filed March 30, 1973), Chapman v. Meier, Civil No. 4664 (D.N.D.).

The last sentence of Rep. Streibel's statement, however, does not reflect quite fully the actions of the Committee on the issue of multi-member districts. On several occasions during its deliberations, the Committee considered the elimination of such districts and, at one point, actually voted to do so. See Minutes of the Special Committee on Reapportionment, October 11–12, 1972, at 7, Supplementary Return (filed January 14, 1974), Chapman v. Meier, supra. After additional debate on this issue, however, the Committee reversed itself and decided to hold the matter in abeyance until an overall reapportionment plan, including multi-member districts, was formulated and adopted. See Minutes of the Special Committee on Reapportionment, November 8–9, 1972, at 9, Supplementary Return, supra.

No further votes on the specific matter of multi-member districts were taken by the Committee, and the following sentence appeared in the Committee's final report:

The Committee also concluded that it had neither the time, nor the necessary data, to divide multi-member districts into sin-

In its journey through the legislature, however, House Bill 1042 underwent substantial alteration. District lines were redrawn. The legislature refused to amend the bill to provide for subdistricts in the larger cities. *See* Senate Journal, January 23, 1973, at 241, Supplementary Return (filed January 22, 1974), Chapman v. Meier, Civil No. 4664 (D.N.D.). The altered reapportionment proposal lost its bipartisan support. Where the original Committee version avoided consideration of partisan politics,[15] the revised plan produced a volley of charges that the district lines were gerrymandered to protect incumbents. *See* Senate Journal, February 15, 1973, at 582–583, Exhibit 5, Return to and Compliance with Order (filed March 30, 1973), Chapman v. Meier, Civil No. 4664 (D. N.D.).

The bill in its altered form was vetoed by Governor Arthur A. Link on February 2, 1973, as "unfair," principally because of the failure of the legislature to create single-member senatorial districts. *See* Veto Message, Exhibit 1, Return to and Compliance with Order, *supra.*

In an atmosphere of politically partisan charges and countercharges, the legislature overrode the Governor's veto by a vote of 72 to 30 in the House and 37 to 14 in the Senate. *See* Exhibit 4, Return to and Compliance with Order, *supra.* Yet this reapportionment never became law: first, because under Section 67 of the North Dakota Constitution, it did not take effect until July 1st after the close of the session; and second, because, prior to July 1st, the effective-

ness of the measure was stayed by the filing of a referendum petition signed by the requisite number of electors, pursuant to Section 25 of the North Dakota Constitution.

In addition, an initiated amendment to the North Dakota Constitution was proposed which would have created a bipartisan commission composed of non-legislators to accomplish reapportionment and which specifically provided for single-member senate districts and single-member house subdistricts thereof. The requisite number of electors signed the initiative petition pursuant to Section 202 of the North Dakota Constitution.

Upon the motion of the plaintiffs, and after a hearing on the matter, we ordered a stay of proceedings in this action pending the outcome of the initiative and referendum elections. Chapman v. Meier, Civil No. 4664 (D.N.D., filed May 25, 1973).

The elections were held on December 4, 1973. House Bill 1042 was rejected by the voters by a vote of 50,729 to 44,363, while the constitutional amendment was defeated by a vote of 53,831 to 43,178. *See* Certificate of the Secretary of State, Attached to Defendant's Motion to Readopt Court-Fashioned Plan (filed December 26, 1973), Chapman v. Meier, Civil No. 4664 (D.N.D.). With the legislature's action thus nullified and the commission device rejected, the matter is once again before our court without any clearly controlling state reapportionment policies for our guidance.

Defendants have moved for an order readopting permanently our reapportion-

---

gle-member subdistricts in an accurate manner. [Report of the North Dakota Legislative Council at 137, Supplementary Return, *supra.*]

For a discussion of data which was made available to the Legislative Council Committee on which it might have subdivided multi-senator districts, if the Committee wished to do so, see text of this opinion, *infra* at n. 20.

15. Gail Hernett, a state senator at the time and chairman of the Special Committee on Reapportionment, was asked by a member of

the Joint Committee on Reapportionment of the legislature to comment on the 14 incumbents who would be required to run against each other under the Legislative Council Plan. Chairman Hernett stated, according to the report of the meeting, that "he could not [comment] because he did not consider politics when drawing this up." Minutes of the Joint Committee on Reapportionment, Jan. 4, 1973, at 2, Exhibit 3, Return to and Compliance with Order (filed March 30, 1973), Chapman v. Meier, Civil No. 4664 (D.N.D.).

ment plan filed June 30, 1972; plaintiffs resist and move for the adoption of a new plan consistent with our order of that date. Having more clearly defined the historical perspective of the instant action, I turn now to an examination of the legal issues.

## II.

The majority today directs that future elections for the state legislature in the major cities of North Dakota shall again be conducted on a multi-member district basis.[16] In continuing these districts, the court has exceeded the permissible bounds of its discretion. *See* Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

We are not here concerned with a legislative adoption of such a reapportionment plan. The only plan ever enacted by the legislature containing the multimember feature was House Bill 1042, which was defeated by the voters in a referendum election. If House Bill 1042 had withstood the voters' attack, the issue before us would be quite a different one and its resolution more evident. For, as the majority correctly points out, the cases clearly hold that the adoption of a multi-member scheme by a legislature does not constitute a *per se* violation of the Constitution. *See* Opinion of Judge Benson, *supra* at 375. But the cases compel a different conclusion when a federal district court is called upon to exercise its discretion in fashioning a new apportionment plan.

The Supreme Court has repeatedly noted the objectionable features of multi-member districting.[17] In Lucas v. Forty-Fourth General Assembly of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L. Ed.2d 632 (1964), for example, the Court stated:

One of the most undesirable features of the existing apportionment scheme was the requirement that, in counties given more than one seat in either or both of the houses of the General Assembly, all legislators must be elected at large from the county as a whole. Thus, under the existing plan, each Denver voter was required to vote for eight senators and 17 representatives. Ballots were long and cumbersome, and an intelligent choice among candidates for seats in the legislature was made quite difficult. No identifiable constituencies *within* the populous counties resulted, and the residents of those areas had no single member of the Senate or House elected specifically to represent them. Rather, each legislator elected from a multimember county represented the county as a whole. [377 U.S. at 731, 84 S.Ct. at 1471 (footnote omitted).]

Seven years later, in the key case of Whitcomb v. Chavis, 403 U.S. 124, 91 S. Ct. 1858, 29 L.Ed.2d 363 (1971), while upholding a legislatively created multimember scheme against a head-on constitutional attack, the Court stated:

We are not insensitive to the objections long voiced to multi-member district plans. Although not as prevalent as they were in our early history, they have been with us since colonial times and were much in evidence both before and after the adoption of the Fourteenth Amendment. Criticism is rooted in their winner-take-all aspects, their tendency to submerge mi-

16. The 21st district including the cities of Fargo (population 53,365), West Fargo and Industrial Park (population 5,265), and some outlying areas of Cass County, embraces a total population of 60,242, and shall have five senators and ten representatives; the 5th District, Minot area and airbase (population 49,908), four senators and eight representatives; the 8th District, Grand Forks and airbase (population 51,243), four senators and eight representatives; the 32nd District, Bismarck area (population 35,596),

three senators and six representatives; and finally, the 29th District, Stutsman County including Jamestown (population 23,550), two senators and four representatives. Representatives from multiple-senate districts amount to 35 percent of the legislature. *See* Opinion of Judge Benson, *supra*.

17. *See generally* Carpeneti, Legislative Apportionment: Multimember Districts and Fair Representation, 120 U.Pa.L.Rev. 666 (1972).

norities and to overrepresent the winning party as compared with the party's statewide electoral position, a general preference for legislatures reflecting community interests as closely as possible and disenchantment with political parties and elections as devices to settle policy differences between contending interests. The chance of winning or significantly influencing intraparty fights and issue-oriented elections has seemed to some inadequate protection to minorities, political, racial, or economic; rather, their voice, it is said, should also be heard in the legislative forum where public policy is finally fashioned. In our view, however, experience and insight have not yet demonstrated that multi-member districts are inherently invidious and violative of the Fourteenth Amendment. [403 U.S. at 157–160, 91 S.Ct. at 1876–1877 (footnotes omitted).][18]

Thus, although multi-member districting does not amount to an Equal Protection violation, there are sufficient undesirable characteristics adhering to it to testify restricting its use in court-fashioned plans, absent special circumstances. This is precisely the rule which must control our decision in the case at bar, and it was enunciated by the Supreme Court under its supervisory power over federal courts in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971).

The majority has unsuccessfully sought to distinguish away this controlling precedent by characterizing Connor

v. Johnson as a racial discrimination case. This is a misreading of the fact situation, for it is a straight population variance case.

On May 14, 1971, a three-judge district court in the Southern District of Mississippi invalidated the then-existing Mississippi legislative reapportionment statute, because of a total variance of 26 percent between the largest and smallest districts, and, on the eve of the forthcoming 1971 legislative elections, attempted to fashion an interim plan of reapportionment—much as this court was called upon to do in the instant case in June 1972. Connor v. Johnson, 330 F.Supp. 506 (S.D.Miss.1971).

The district court's judgment was that single-member districting would be "ideal" for Hinds County, Mississippi, but that insufficient time remained before the candidate filing deadline, 17 days away, to perform the task of dividing this county into single-member districts. The three-judge court therefore issued a reapportionment plan calling for the at-large election of five senators and 12 representatives in Hinds County. Much like the action which we initially took in this case on June 29–30, 1972, that court promised to appoint a special master to investigate the possibility of single-member districts for the subsequent elections there in 1975 and 1977.

Plaintiffs promptly applied to the United States Supreme Court for a stay, requesting that the filing date for elections be postponed and that the district court provide single-member districts in

---

18. The Court in *Whitcomb* also discussed the thesis, expounded by Professor John Banzhaf in Banzhaf, Multi-Member Electoral Districts—Do They Violate the "One Man, One Vote" Principle, 75 Yale L.J. 1309 (1966), that residents in multi-member districts are overrepresented as a result of bloc-voting, but found no such showing in that case. 403 U.S. at 144–148, 91 S.Ct. 1858.

Dick Dobson, author of the Dobson Plan, political editor of the Minot Daily News and a delegate to the North Dakota Constitutional Convention, does not favor the multi-senate district proposal which the majority adopts in its plan, for Dobson has said:

It simply is not fair to allow a voter in an urban district to participate in the election of four senators while his neighbor in a rural district participates in the election of only one senator. It has been shown mathematically that multi-member electoral "systems contain inherent inequalities in representation." In decisions to date, the United States Supreme Court has not charted a clear path on this issue. Yet one fact is certain: Single-member districts are the essence of equal representation. [Dobson, Reapportionment Problems, 48 N.D.L.Rev. 281, 289 (1972).]

Hinds County. The Supreme Court granted the application, stating:

> The district court is instructed, absent insurmountable difficulties, to devise and put into effect a single member district plan for Hinds County * * *. [402 U.S. at 692, 91 S.Ct. at 1762.]

The court laid down the following standard for district courts exercising discretion in fashioning apportionment plans:

> We agree that when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter. [402 U.S. at 692, 91 S.Ct. at 1762.]

I am satisfied that this standard remains the law which governs our decision. In Connor v. Williams, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972), decided after Whitcomb v. Chavis, *supra*, the Supreme Court reviewed another challenge to the district court's Mississippi reapportionment plan and reemphasized its holding in the earlier *Connor* case, stating:

> The District Court retained jurisdiction over these three counties and ordered that a Special Master be appointed in January 1972 to "take testimony and make findings as to whether the Counties of Hinds, Harrison, and Jackson may feasibly be divided into districts of substantially equal numbers in population for the elections of 1975 and 1979." 330 F. Supp., at 519. Such proceedings should go forward and be promptly concluded, for, as this Court has emphasized, "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." Connor v. Johnson, 402 U.S. 690, 692, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). [404 U.S. at 551, 92 S.Ct. at 659.]

Most recently, in Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court examined the state legislature's apportionment of Virginia which had been invalidated by a three-judge district court. Although the Supreme Court reversed the district court in adopting a new standard on permissible population variances in state plans, it did affirm the trial court's use of multi-member districts in reapportioning certain areas containing military personnel. Because of "unusual, if not unique, circumstances" involving severe time pressures, the Court permitted the multi-member plan to stand, but only on an interim basis. 410 U.S. at 331–332, 93 S.Ct. 979. In reaching this decision, the Court noted that:

> The [district] court conscientiously considered both the legislative policy and this court's admonition in Connor v. Johnson, *supra*, that in fashioning apportionment remedies, the use of single-member districts is preferred. evidence of substantial malapportionment with respect to military personnel * * * and the fear that too much delay would have seriously disrupted the fall 1971 elections. Facing as it did this singular combination of unique factors, we cannot say that the District Court abused its discretion in fashioning the interim remedy of combining the three districts into one multimember district. [410 U.S. at 333, 93 S.Ct. at 989.]

Turning to the case at bar, it should be obvious that we are long past the "interim" remedy stage of *Mahan*. The conditions which justified the creation of multi-member senate districts in 1965 by the court in *Paulson II*, and which justified the temporary continuation of these districts by our court in 1972, have faded into history. I can find no valid state legislative policy nor any practical grounds at the present time justifying the use of multi-member senate districts in North Dakota. Thus, under the language of *Mahan* and the holdings in the two *Connor* cases, the continuance of multi-member senate districts constitutes an abuse of discretion by this court.

I have read the complete record in this case with care, and find no reasons advanced anywhere in that record for continuing multi-member senate districts as either furthering the art and science of politics or improving the conduct of state government. However, the record does disclose several arguments in favor of the more traditional single-member senate districts:

(1) It gives a voter a chance to compare only two candidates, head to head in making a choice.

(2) It prevents one political party with a heavy plurality in one or two potential districts from dominating other poential districts that might narrowly go for the candidate of the opposite party.

(3) It prevents a city wide political organization from ostracizing or disciplining a legislator, who dares stray from the machine's line.

(4) It permits a citizen to identify a legislator as his senator and makes direct communication easier.[19]

(5) It makes each senator responsible for his actions and makes it difficult for a senator to fade into the ranks of "the team" to avoid being identified with specific actions taken.

(6) It reduces campaign costs and "personalizes" a campaign.

(7) It creates greater interest in the possibility of a citizen seeking a legislative seat without the political machine blessing.

(8) It would diminish the animosity created in the legislature against multi-senate districts because of the tendency of senators elected by one political party from a city to vote as a bloc.

(9) It would tend to guarantee an individual point of view if all senators are not elected as a team.

(10) It would equalize the power of people in single senate districts with the people in the broken down multi-senate districts to *influence* the *election* of *only one* senator.

From North Dakota's earliest days, the policy of single-member senate districts was an integral part of its political tradition. Section 29 of the Constitution of 1889 required such districts and controlled all elections in the state until it was invalidated as an almost accidental by-product of the federal district court's decision in *Paulson II*. *See* State ex rel. Stockman v. Anderson, 184 N.W.2d 53, 57–58 (N.D.1971). When a panel of this court adopted with some hesitancy a truly unprecedented multi-member senate plan in *Paulson II*, the court said:

We have exhaustively considered the plan as set forth in Senate Bill 39 [which we hereby adopt]. We find it not perfect. Five "multi-member" districts are created; county lines are violated in twelve instances. * * * Insofar as the multi-member districts are concerned, if experience proves that practical difficulties or inequities result therefrom, appropriate remedial legislation may reasonably be expected. [246 F.Supp. at 44.]

In the nine years since the court in *Paulson II* first introduced multi-member senate districts to North Dakota,

---

19. For example, in the 21st District encompassing the cities of Fargo and West Fargo, four of the five senators live in the extreme south side of Fargo; only one resides in the northern section of Fargo. No state senator resides in West Fargo. I take judicial note of these facts and that, generally speaking, the most affluent citizens in the 21st Legislative District are concentrated on Fargo's south side. *See* Fargo Forum, January 29, 1974, at 9, c. 1 (morning edition).

they have been the subject of unceasing political, philosophical, and legal disputes.[20] Confronted with "practical difficulties or inequities" referred to in *Paulson II*, the legislature has been unable to resolve this bitterly divisive issue in a manner acceptable to the electorate. A court plan which has produced and continues to produce this kind of disruptive results ought not to be readopted. This, unfortunately, is exactly what the majority has done.

The evidence is at hand to permit the fashioning of a remedial plan which subdivides the multi-member senate districts in North Dakota's major cities. During the hearings of the Special Committee on Reapportionment, the late Mr. R. R. Smith, one of the court's Special Masters, advised the Committee that he had successfully formulated single-member districts for the cities of Bismarck, Grand Forks, and Minot. *See* Minutes of the Special Committee on Reapportionment, October 11–12, 1972, at 5, and November 8–9, 1972, at 5, Supplementary Return, *supra.* Mr. Ostenson, also one of our Special Masters, assured the Committee that:

> [I]t is not difficult to divide multi-member districts into single-member districts in Fargo and West Fargo, but in other cities it may be necessary to make ground surveys and estimate the population within enumeration districts. Mr. Ostenson said that if the Committee selects a reapportionment plan, it would not be terribly difficult to adopt single-member districts. [Minutes of the Special Committee on Reapportionment, Nov. 8–9, 1972, at 8, Supplementary Return, *supra.*]

Mr. Ostenson also assured this court that with present census data plus some added ground surveys, the existing multi-member senate districts may be subdivided into single-member senate districts. *See* Comments to Ostenson Plan, attached as Appendix B, Chapman

v. Meier, Civil No. 4664, 372 F.Supp. 363 (D.N.D., filed June 30, 1972).

Given this information, the court should proceed to comply with the Supreme Court's admonition in Connor v. Johnson, *supra,* and establish single-member senate subdistricts within North Dakota's urban areas.

### III.

The Dobson Plan cannot stand as a permanent reapportionment plan for North Dakota for a second major reason: it contains unconstitutionally large population disparities between districts. The largest district (population 13,176) exceeds the size of the ideal district by 8.8 percent; the smallest (population 10,728) falls short of the ideal by 11.4 percent—a total deviation of more than 20 percent and a deviation ratio of 1.-23–1. *See* Chapman v. Meier, Civil No. 4664, 372 F.Supp. 363 at 365 n. 4 (D. N.D., filed June 30, 1972).

In our original consideration of this case, the court fashioned interim relief based on the fact that the case came to us on the eve of the 1972 elections. We sought to avoid disruption of the impending elections and, with that consideration in mind, selected the Dobson Plan because it effected less change in the then-existing legislative lines compared to other plans.[21] It is now the time to reevaluate this plan's variances calmly in light of the Constitution and without these unusual circumstances, but the question is: what standards to apply?

In Connor v. Williams, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972), a court-fashioned plan for Mississippi's state legislature—containing a total variance of 18.9 percent—was attacked as unconstitutional based on Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), and Wells v. Rockefeller, 394 U.S. 542, 89 S.Ct. 1234, 22 L. Ed.2d 535 (1969). The Supreme Court, however, chose not to reach this issue,

---

**20.** *See* text of this opinion at notes 4–6, 14–15, *supra.*

**21.** *See* text of this opinion at note 10, *supra.*

and instead vacated the district court's order pending completion of proceedings consistent with the Court's earlier mandate in Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). Since that time, the Court has more clearly defined the Equal Protection standards applicable to population deviations in legislative redistricting plans enacted by state legislatures. Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). However, it remains an open question whether a more stringent standard, one of "absolute equality," applies to reapportionment schemes fashioned by federal district courts in the exercise of their equity power. But even assuming, *arguendo*, that *Mahan's* flexible standard controls court-fashioned plans as well as plans enacted by legislatures, it seems to me that the variances in the Dobson Plan are in all likelihood too great to pass constitutional muster, particularly since no justification is shown on the record for continuing the use of this plan.

The touchstone of the *Mahan* case is its reaffirmation of a statement from Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), that:

So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. [377 U.S. at 579, 84 S.Ct. at 1391.]

Applying this flexible standard to the legislative reapportionment by the Virginia General Assembly, the Court upheld a 16.4 percent variation between the largest and smallest districts on the grounds that the deviation arose from a valid state policy of maintaining the integrity of political subdivision lines. Noting that the proper equal protection test is not framed in terms of "governmental necessity," but simply in terms of a claim that a state legislature may "rationally consider," 410 U.S. at 326, 93 S.Ct. 979, the Court concluded:

Neither courts nor legislatures are furnished any specialized calipers that enable them to extract from the general language of the Equal Protection Clause of the Fourteenth Amendment the mathematical formula that establishes what range of percentage deviations is permissible, and what is not. The 16-odd percent maximum deviation that the District Court found to exist in the legislative plan for the reapportionment of the House is substantially less than the percentage deviations that have been found invalid in the previous decisions of this Court. While this percentage may well approach tolerable limits, we do not believe it exceeds them. Virginia has not sacrificed substantial equality to justifiable deviations. [410 U.S. at 329, 93 S.Ct. at 987.]

Here, however, I cannot say that on the present record the Dobson Plan "has not sacrificed substantial equality to justifiable deviations." Not only does the Plan include a deviation greater than the 16.4 percent upheld in *Mahan*, but more importantly it is not justified by any rational state policy now in effect. It is clear for example that the State of North Dakota has not adopted, either by legislative action or otherwise, a firm policy of strictly adhering to political subdivision lines,[22] such as the Virginia policy found so important by

---

22. In *Paulson II*, a panel of this court determined that the 1965 legislature had retreated from the earlier policy of the State of North Dakota which accorded legislative representation on a county-wide basis. 246 F.Supp. at 42–43. Moreover, in oral argument on a motion for stay in the case at bar, counsel for defendant-Meier defended House Bill 1042 in its amended form as passed by the legislature, by stating:

True, the Plan cuts through county lines, but that is not a criteria. There is no

the Supreme Court in *Mahan*. Absent some such policy to justify the large population deviation of the Dobson Plan, the Equal Protection Clause requires this court to adopt an apportionment plan with less variance between districts.[23]

## IV.

In dissenting, I believe that it behooves me to offer my suggestions for resolving the case before us, particularly since the Supreme Court may once again be called upon to review the decision of this court.[24]

On June 30, 1972, we expressed tentative approval for the Ostenson Plan. Since that time, the Special Committee on Reapportionment of the North Dakota Legislative Council has considered the Ostenson Plan, the Dobson Plan, and many others, and with staff assistance arrived at a different reapportionment plan which it recommended to the legislature. The information which it gathered and the work that it performed are available to us. *See* text of this opinion at note 13, *supra*. That plan, as noted, keeps population deviation to a minimum. It seems to me that we might follow the precedent of an earlier panel of this court which adopted a committee plan recommended to the 1965 North Dakota Legislature in *Paulson II*,[25] and give careful consideration to the plan presented to the 1973 North Dakota Legislature by this bipartisan citizens-legislators committee.

Since 1931, the legislature of this state has been unable successfully to reapportion itself, and that duty now rests in our court. In the exercise of this duty, our function is to devise the best plan possible in conformity with the Constitution and the supervisory guidelines provided by the Supreme Court. Single-member districts have proved advantageous in assuring the citizens of a

North Dakota constitutional provision which addresses itself to that. The one we had is, of course, no longer applicable. [Transcript of Proceedings, held May 25, 1973, Chapman v. Meier, Civil No. 4664 (D.N.D.), at 4–5.]

23. The Dobson Plan was reviewed and rejected by the Special Committee on Reapportionment of the Legislative Council during its hearings. *See* Minutes of the Special Committee on Reapportionment, October 11–12, 1972, at 305, Supplementary Return (filed Jan. 14, 1974), Chapman v. Meier, Civil No. 4664 (D.N.D.). Ultimately, that Committee recommended a plan containing a total deviation of only 3.6 percent. *See* Report of the Special Committee on Reapportionment & Legislative Council Plan, Supplementary Return, *supra*.

24. The defendant sought a stay of our June 30th order from the Supreme Court, urging that the 1973 elections be held under the prior 1965 court plan. Justice Blackmun denied the stay on July 17, 1972.

25. The *Paulson II* court said, regarding the committee and the 1965 committee plan:
For several months prior to the commencement of the next session of that Assembly (the Thirty-ninth), the Legislative Research Committee had been considering such proposed legislation. That Committee had engaged Mr. R. R. Smith, a qualified and experienced Certified Public Accountant and resident of this state, to prepare and submit a plan of legislative apportionment based as precisely as practicable upon population as revealed by the 1960 federal census, but bearing in mind certain appropriate guiding principles with emphasis upon maintaining the integrity of county boundaries, where possible. Such a plan was prepared and submitted to a subcommittee of the LRC; said subcommittee unanimously approved it. Public hearings were thereafter held in different cities of the state. The LRC was composed of nineteen members; nine were experienced and influential members of the legislature, ten were prominent citizens of the state who, by reason of their places of residence, fairly represented the various sections of the state. Each of the major political parties was represented. The plan, as approved by the subcommittee, was thereafter unanimously approved by the LRC and submitted to the Legislative Assembly for action, under the designation Senate Bill 39. Senate Bill 39 was adopted by the Senate but rejected by the House of Representatives. [246 F.Supp. at 44.]

district meaningful representation, whole multi-member districts have been the subject of constant criticism by scholars, legislators, and courts. The Supreme Court recognized this in Connor v. Johnson, *supra*, and thus we are obligated to fashion an appropriate plan containing single-member senate districts in North Dakota's metropolitan areas.[26]

Apart from the necessity of subdividing these multi-member senate districts, lest I be misunderstood, I wish to make it clear that I am not saying that the Dobson Plan must be rejected out of hand by this court. Defendant-Meier should be given the opportunity to justify the Plan's continued existence upon a showing that it does indeed serve some rational state policy offsetting the population variances.

Accordingly, I would set a hearing upon the motions now before us. Pending this hearing, I would direct the Masters: [27]

1) to study and report to the court concerning the merits of the Legislative Council Reapportionment Plan;

2) to submit proposals to us for subdividing the existing multi-member senate districts of the Dobson Plan in Bismarck, Fargo, Minot, Grand Forks, and Jamestown, and the comparable multi-member senate districts proposed in the Legislative Council's Plan; and

3) to make recommendations concerning the proper handling of the military population at Grand Forks and Minot airbases for reapportionment purposes.

---

26. I contrast the result proposed by the majority in this case with that of the three-judge district court in Beens v. Erdahl, 349 F.Supp. 97 (D.Minn.1972), which in reapportioning Minnesota's legislature transformed multi-member House districts into single-member seats and kept the total deviation under 4 percent.

---

27. I would recommend the appointment of Mr. Gail Hernett, a former state senator and the former Chairman of the Special Committee on Reapportionment, to replace the late Mr. R. R. Smith as a Special Master.